# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-DR-01086-SCT

*LAWRENCE BRANCH*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/23/2002 |
| TRIAL JUDGE: | HON. C. E. MORGAN, III |
| COURT FROM WHICH APPEALED: | CARROLL COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MISSISSIPPI OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY: WILLIAM J. CLAYTON |
| | ROBERT M. RYAN |
| | LOUWLYNN VANZETTA WILLIAMS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: PAT McNAMARA |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | PETITION FOR POST-CONVICTION RELIEF, DENIED - 05/17/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     After this Court affirmed on direct appeal Lawrence Branch's capital murder conviction and death sentence, Branch filed with us his Petition for Post-Conviction Relief with Exhibits (PCR) and his Amendment to the Petition for Post-Conviction Relief with Exhibits (amended PCR) pursuant to the Mississippi Uniform Post-Conviction Collateral Relief Act (Miss. Code Ann. §§ 99-39-1, *et seq*. (Rev. 2000)). Also before the Court are the

corresponding responses by the State of Mississippi and Branch's replies thereto. Finding that Branch is not entitled to any post-conviction relief, we deny Branch's PCR and the amended PCR.

¶2. Branch was found guilty of capital murder for the January 21, 2001, killing of Dorothy Jorden. ***Branch v. State***, 882 So. 2d 36 (Miss. 2004). Branch was subsequently sentenced to death by the same jury. ***Id.*** Branch raised nineteen issues on direct appeal and, finding no reversible error, this Court affirmed Branch's conviction and death sentence. ***Id.*** Branch's motion for rehearing was denied September 30, 2004. Branch thereafter petitioned the United States Supreme Court for writ of certiorari, which was denied March 7, 2005. ***Branch v. Mississippi***, 544 U.S. 907, 125 S. Ct. 1595, 161 L. Ed.2d. 282 (2005).

## FACTS

¶3. The following facts are gleaned from the opinion of Branch's direct appeal. A more complete statement of the facts can be found in that opinion. ***Branch***, 882 So. 2d at 44-47.

¶4. After working the 3-11 p.m. shift at Heatcraft in Grenada on January 20, 2001, Lawrence Branch drove to the home of his cousin, Deondray Johnson. Johnson had a piece of furniture wood with him. The two then went to Dot's Burger Bar ("Dot's"), a restaurant and club owned by the victim, Dorothy Jorden. Dot's Burger Bar is located in Coila, a small community in Carroll County. Branch and Johnson stayed until closing. Before leaving Dot's, Branch and Johnson promised to return and give Johnson's mother, Janie Johnson, a ride home. Branch never returned to give Ms. Johnson a ride home.

2

¶5.    At approximately 4:00 p.m. on January 21, Jorden's body was found inside her home in a pool of blood. It was apparent that Jorden was beaten in the head outside because there was a bloody indentation in the ground about the size of an adult head. Jorden's earring was also found in that indentation. Additionally, a broken stick of wood was found in the woods.

¶6.    Carroll County Sheriff Donald Gray went to Branch's home and took the clothing that Branch said he wore the night before. Deputies Spellman and Michael Peeples went to Johnson's house and brought him in for questioning. While at the Johnson home, the officers found wood which appeared to be identical to the broken stick found in the woods. The officers also took the clothing Johnson wore the night before.

¶7.    Law enforcement officials questioned Branch at the station, released him to go to work, questioned Johnson, and then brought Branch in for more questioning. Branch and Johnson admitted being together all evening, but their stories did not match. A videotape reveals Branch describing the events after he and Johnson left Dot's. The events described are as follows: After dropping off Mary Jenkins and Anthony Gatewood, two patrons from Dot's who Branch and Johnson agreed to give a ride home, Branch and Johnson stopped on the side of the road and walked through the woods where they discussed robbing Jorden. Branch and Johnson watched Jorden leave her house to drive Janie Johnson and a male companion home. When Jorden returned, Johnson was near a vehicle already parked in the yard and Branch was alongside the house. That is when Johnson came up from behind and struck Jorden. Branch stated, ". . . I was just holding her down. I hold [sic] her down where I could get the money out of her pocket." He later indicated that he hit Jorden three times and

3

Johnson hit Jorden three times. Then they dragged her body into the house and sat her up on the floor. After searching for more money, they left with approximately two hundred dollars and Jorden's pistol.

¶8. Several days after Branch was arrested, Branch's father, Willie Branch, found a white plastic bag in high grass and weeds on the Johnsons' property. Willie Branch and Branch's attorneys turned the bag over to the Sheriff. The bag contained a pistol, money, food stamps, and coin wrappers.

¶9. An autopsy was performed on Jorden by Dr. Steven Hayne, and the results revealed that Jorden died from closed head injuries secondary to blunt force trauma. Based upon the bruising and tearing of the flesh, Dr. Hayne estimated that Jorden was struck approximately five to six times on the top of the head and that these blows would have required a considerable amount of force. Defensive wounds were found on Jorden indicating that she was conscious during at least part of the attack.

¶10. Evidence of blood was found on Johnson's clothing, and a DNA comparison revealed that the blood was Jorden's. Jorden's blood was also found on the broken stick. Tests likewise confirmed that the two pieces of wood found previously constituted one piece and that both pieces were consistent with other wood found at Johnson's home. Johnson's palm print was found on one of the food stamps within the white bag found by Willie Branch. The pistol found in the bag was traced back to Jorden through the serial number.

DISCUSSION

¶11.   Branch raises six grounds for relief in his PCR and the additional claim of mental retardation in his amended PCR.  Those assignments of error are issues III-IX.  Issues I and II are arguments regarding whether procedural bars and the doctrine of res judicata should apply in this case.  These issues will be addressed in order.

## I.    THE DOCTRINE OF RES JUDICATA AS A PROCEDURAL BAR TO GENERAL POST-CONVICTION CLAIMS

¶12.   Branch contends that the claims raised in his petition for post-conviction relief are so meritorious and of such a nature that the procedural bar known as the doctrine of res judicata should not apply in this case.  Miss. Code Ann. § 99-39-21(3) (Supp. 2006) states:  "The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal."  Branch argues that "drastic changes in the capital case law landscape have placed a significantly increased burden on the appellate courts in cases where a life is at stake."

¶13.   In *Lockett v. State*, 614 So. 2d 888 (Miss. 1992), this Court considered the post-conviction application of Carl Daniel Lockett, who like Branch, was convicted of capital murder and sentenced to death.  Also like Branch, Lockett readily admitted that some of the issues raised in his post-conviction application were raised on direct appeal and decided adversely to him. *Id.* at 893.  Lockett urged this Court to "reconsider precedent governing those issues and address the claims raised because each claim concerns issues still debated in this country's death penalty jurisprudence." *Id.*  This Court stated:

The procedural bars of waiver, different theories, and *res judicata* and the exception thereto as defined in Miss. Code Ann. § 99-39-21(1-5) are applicable in death penalty PCR Applications. *Irving v. State*, 498 So. 2d 305 (Miss. 1986); *Evans v. State*, 485 So. 2d 276 (Miss. 1986). Rephrasing direct appeal issues for post-conviction purposes will not defeat the procedural bar of *res judicata*. *Irving v. State*, 498 So. 2d 305 (Miss. 1986); *Rideout v. State*, 496 So. 2d 667 (Miss. 1986); *Gilliard v. State*, 446 So. 2d 590 (Miss. 1984). The Petitioner carries the burden of demonstrating that his claim is not procedurally barred. Miss. Code Ann. § 99-39-21(6) (Supp. 1991); *Cabello v. State*, 524 So. 2d 313, 320 (Miss. 1988). However, "an alleged error should be reviewed, in spite of any procedural bar, only where the claim is so novel that it has not previously been litigated, or, perhaps, where an appellate court has suddenly reversed itself on an issue previously thought settled." *Irving v. State*, 498 So. 2d 305, 311 (Miss. 1986).

614 So. 2d at 893 (footnote omitted).

¶14. In today's case, the State contends that "every single assignment of error set forth in Branch's Petition for Post Conviction Relief is barred under the doctrine of res judicata." In our analysis, each of the issues raised by Branch in his PCR and his amended PCR will be reviewed to see if he has demonstrated a novel claim or a sudden reversal of law relative to his claim that would excuse him from the procedural bar. If Branch has not made such a showing, the procedural bar of res judicata applies.

## II. THE DOCTRINE OF RES JUDICATA AS A PROCEDURAL BAR TO CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL AND MENTAL RETARDATION

¶15. On direct appeal, Branch presented claims of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L. Ed.2d 674 (1984), and mental retardation under *Atkins v. Virginia*, 536 U.S.304, 122 S. Ct. 2242, 153 L. Ed. 2d 335

6

(2002). *See Branch v. State*, 882 So. 2d at 49-59. This Court rejected those claims. *Id.* Branch now asserts that he should not be precluded from raising the same issues again.

A.      *M.R.A.P. 22(b) and a meaningful opportunity to seek post-conviction relief.*

¶16.    Branch's argument is similar to that presented in Issue I, being that procedural bars should not apply because the direct appeal process did not allow him an adequate opportunity to present a fully developed argument to support his *Strickland* and *Atkins* claims. He further asserts that the direct appeal process does not allow him access to the files of trial counsel, law enforcement officials, and the prosecutor, or allow him to secure a mitigation expert or an evidentiary hearing, otherwise available under M.R.A.P. 22(c), (d), and (e).

¶17.    Branch argues that no procedural bar should prevent this Court from reconsidering his *Strickland* and *Atkins* claims. Further, Branch asserts his right to effective post-conviction relief counsel, and argues that failure of this Court to reconsider his *Strickland* and *Atkins* claim would deny him that right.

¶18.    Branch was represented on direct appeal by counsel other than his trial counsel. M.R.A.P. 22(b), as it existed at the time of Branch's trial and direct appeal, stated:

> Issues which may be raised in post-conviction proceedings may also be raised on direct appeal. Where the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute a waiver barring consideration of the issues in post-conviction proceedings.[1]

---

[1]M.R.A.P. 22(b), amended effective February 10, 2005, now states: "Issues which may be raised in post-conviction proceedings may also be raised on direct appeal *if such issues are based on facts fully apparent from the record*. Where the appellant is represented

7

***Branch***, 882 So. 2d at 49. Branch raised the issues of mental retardation and ineffective assistance of counsel on direct appeal. Extraneous facts and appendices submitted on direct appeal that were not part of the trial record were challenged by the State; however, this Court allowed consideration of the extraneous material. For reasons fully discussed in the opinion on Branch's direct appeal, this Court held that "Branch must raise ***Atkins*** and ineffective assistance of counsel issues in this direct appeal or he will be barred from doing so in subsequent appeals." ***Id.*** Therefore, this Court permitted Branch to proceed with these issues, and we considered the additional documents supplied in his Appendices to Original Brief of Appellant. ***Id.***

¶19.　This Court has also previously stated that "[i]f new counsel on direct appeal is required to assert collateral claims, there must be an opportunity to submit extraneous facts and discovery and evidentiary hearing to develop and prove the allegations." ***Id.*** (citing ***Brown v. State***, 798 So. 2d 481, 491 (Miss. 2001); ***Smith v. State***, 477 So. 2d 191, 195 (Miss. 1985); ***Turner v. State***, 590 So. 2d 871, 874 (Miss. 1991); and ***Jackson v. State***, 732 So. 2d 187, 190 (Miss. 1999)). Thus, Branch's argument that M.R.A.P. 22(c) violates his federal and state constitutional rights is without merit.

---

by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute a waiver barring consideration of the issues in post-conviction proceedings." (Emphasis added to indicate the 2005 amendment).

### B.  Claims of mental retardation.

¶20.  Branch asserts that he has not been afforded an opportunity to present a mental retardation claim.  He asserts that such claims are appropriate for post-conviction proceedings but he was forced to present the issue on direct appeal.  He further asserts that he has tried to comply with the requirements of *Chase v. State*, 873 So. 2d 1013 (Miss. 2004) and this Court has consistently refused to allow him to comply.

¶21.  In *Chase,* this Court set the limits and defined the procedure which will safeguard the Eighth Amendment protection of mentally retarded persons, as required by *Atkins*.  *Chase* was handed down on May 20, 2004 – seven weeks after Branch's direct appeal was submitted on March 31, 2004, and one week before Branch's direct appeal was decided on May 27, 2004.

¶22.  Branch filed a motion for rehearing and argued that he must be given an opportunity to comply with the procedure established in *Chase*.  Attached to Branch's motion for rehearing as "Exhibit A" was an undated affidavit from Daniel Grant, Ph.D.[2]  The State filed a motion to strike the exhibit, and this Court granted the motion.  *Branch v. State*, 2004 Miss. LEXIS 1219 (Miss. Sept. 30, 2004).

---

[2]The same exhibit appears as "Exhibit 2" of Branch's PCR , although unsigned by Dr. Grant.  In Branch's PCR reply brief, the affidavit appears as "Exhibit 1," this time signed but undated.

¶23.    First, Branch's argument that he has not had a single opportunity to present a mental retardation claim is false.  The issue of Branch's mental retardation was considered on its merits.  Specifically, this Court held:

> The burden of proof is on the defendant claiming mental retardation. ***Goodin [v. State]***, 856 So. 2d [ ] at 276 (¶ 22). In ***Goodin***, we pointed out that:
>
> The Legislature adopted the following standard in Miss. Code Ann. § 41-21-61(f) (Rev. 2001), dealing with commitments, which states in part:
>
>> (f) "Mentally retarded person" means any person (i) who has been diagnosed as having substantial limitations in present functioning, manifested before age eighteen (18), characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work. . .
>
> ***Goodin***, 856 So. 2d at 276-77 (¶ 23).
>
> Branch argues that he is mentally retarded and, therefore, cannot be executed for this crime. In support of his argument, Branch relies solely on the Psychological Evaluation performed by the Region VI Mental Health-Mental Retardation Center on March 15, 1985, and the synopsis of that diagnosis in the 2002 court-ordered evaluation performed after Branch was arrested. Both documents were available to trial counsel; however, apparently as part of a trial strategy, neither document was used in the trial of this case.
>
> At the time of the 1985 evaluation, Branch was five years, three months old. Then seventeen years later and after his arrest in this case, the trial court ordered W. Criss Lott, Ph.D., a clinical psychologist, to perform a mental evaluation on Branch. In doing so, Dr. Lott acknowledged the previous testing:
>
>> On that evaluation [Branch] obtained an IQ of 68 on the Stanford-Binet Intelligence Scale, Form L-M. He also obtained an IQ of 41 on the Peabody Picture Vocabulary Test, Form B, and a Social Age Equivalent of 6.0 and Social Quotient of 113 (this appears to be a mistake). He also obtained a mental score

of 3 years 6 months on the Goodenough-Draw-A-Man-Test. At that time he received the diagnosis of mild mental retardation with unknown etiology.

However, the March 10, 2002, forensic mental evaluation of Branch reveals a different result. Branch was administered two separate tests. The Wechsler Adult Intelligence Scale-III (WAIS-III) revealed a verbal IQ of 91 (low average range), a performance IQ of 76 (borderline range), and a full scale IQ of 84 (low average range). The Wide Range Achievement Test-III (WRAT-3) revealed a reading score in the average range and at the high school level; the arithmetic score was in the low average range and at a sixth grade level. Dr. Lott indicated that "the results are considered an accurate reflection of his current level of functioning."

While Branch may have manifested intellectual limitations at the age of five, he does not have substantial limitations in present functioning which "exist[] concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work." In fact, Branch has displayed no limitations in these adaptive skills areas. At the time of the evaluation, Branch was appropriately groomed and properly maintained personal hygiene, possessed a driver's license, was responsible for buying clothing, groceries, and personal items. He completed school through the 9th grade and attended GED classes. Branch was employed at the time of his arrest. Branch performed household chores for relatives and people in the neighborhood. He helped raise money for the church and community.

Under these facts, Branch has not made a prima facie showing that he falls within the category of persons protected under *Atkins*. Under the guidelines of the American Psychiatric Association, Branch only meets the third criterion, that consisting of an onset of the manifestation prior to age 18; however, Branch fails to meet either of the first two criterion. Therefore, this issue is without merit.

*Branch*, 882 So. 2d at 50-51.

¶24.    Branch filed his Petition for Writ of Certiorari with the United States Supreme Court on December 29, 2004, and his petition was placed on the docket January 4, 2005 as No. 04-

11

7946. ***Branch v. Mississippi***, 544 U.S. 907 (2005). In his third issue before the United States Supreme Court, Branch argued that this Court was required to consider Dr. Grant's affidavit in light of the intervening decision in ***Chase***. The U.S. Supreme Court denied Branch's petition for writ of certiorari on March 7, 2005. ***Id***.

¶25. In ***Chase***, we set forth specific requirements to be followed by the small number of persons with mental retardation claims convicted before ***Atkins*** and ***Chase*** were handed down. ***Chase***, 873 So. 2d at 1023. This Court made clear that as a person convicted before ***Atkins*** was handed down, Chase could not be constitutionally denied the opportunity to present his mental retardation claim to the trial court where he had demonstrated that his IQ fell within the range of possible mental retardation, and he presented an affidavit of a mental health care professional that he suffered from "mild retardation." ***Id.*** Here, Branch has not complied with the necessary procedures nor provided the necessary documentation to rightfully comply with our holding in ***Chase.*** Therefore, we decline to grant relief on this issue.

### C.    *Effective assistance of counsel on direct appeal.*

¶26. Finally, Branch argues that if his appellate counsel was duty-bound to present post-conviction claims on direct appeal, then his appellate counsel was ineffective in the manner in which Branch's mental health was presented. Specifically, Branch accuses appellate counsel of "hurriedly" obtaining a few affidavits, which Branch asserts were "generic, boilerplate statements that conveyed little note (sic) about Petitioner's mental state, background, or intellectual functioning."

12

¶27. The test for ineffective assistance of counsel is well-settled. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. In order to prevail on this claim, Branch must demonstrate that counsel's performance was deficient and that the deficiency prejudiced the defense of the case. *Id*. at 687. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984) (citing *Strickland*, 466 U.S. at 687).

¶28. Defense counsel is presumed competent. *Washington v. State*, 620 So. 2d 966 (Miss. 1993). However, even where professional error is shown, a reviewing court must determine whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mohr v. State*, 584 So. 2d 426, 430 (Miss. 1991). When reviewing a case involving the death penalty, the most important inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer–including an appellate court, to the extent it independently re-weighs the evidence–would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695. If Branch's post-conviction application fails on either of the *Strickland* prongs, the proceedings end. *Foster v. State*, 687 So. 2d 1124, 1129-30 (Miss. 1996).

13

¶29. Branch's appellate counsel presented evidence to this Court on direct appeal, over the State's objection, in support of Branch's mental retardation claim. The extraneous evidence included the forensic mental evaluation of Branch performed on February 28, 2002, by W. Criss Lott, Ph.D., a clinical psychologist, as well as the mental evaluation of Branch performed on March 15, 1985, when Branch was only five years old. Also presented were the affidavits of Dr. Lott, numerous family members, and several of Branch's former teachers. Once this Court affirmed Branch's conviction and sentence on direct appeal, Branch's appellate counsel filed a motion for rehearing with an additional affidavit from Dr. Grant, which this Court struck upon motion by the State. Counsel for Branch then placed this issue before the United States Supreme Court in a petition for writ of certiorari.

¶30. We find that Branch has failed to show that his appellate counsel was deficient and, therefore, he has failed to meet the burden placed upon him by the first prong of *Strickland*. Additionally, Branch's claim of mental retardation failed on the merits on direct appeal. "We must caution that other issues which were either presented through direct appeal or could have been presented on direct appeal or at trial are procedurally barred and cannot be relitigated under the guise of poor representation by counsel." *Foster*, 687 So. 2d at 1129.

    **III.    ADMISSION OF VICTIM IMPACT TESTIMONY**

    **IV.    REFUSAL OF DEFENSE SENTENCING INSTRUCTIONS DS-1, DS-5, AND DS-10**

    **V.    REFUSAL OF DEFENSE SENTENCING INSTRUCTION DS-2, DEFINITION OF "MITIGATING CIRCUMSTANCES"**

14

**VI.     REFUSAL OF DEFENSE SENTENCE INSTRUCTION DS-1, THE BURDEN OF PROOF**

**VII.    EFFECTIVENESS OF COUNSEL AT ALL STAGES OF THIS PROSECUTION**

       **A.1.     INVESTIGATION AND PRESENTATION OF BRANCH'S MENTAL RETARDATION CLAIM DURING THE PENALTY PHASE OF THE TRIAL**

       **A.2.     FAILURE TO INTRODUCE MENTAL HEALTH MITIGATION OTHER THAN THE FINDING OF MENTAL RETARDATION**

       **A.3.     FAILURE TO INVESTIGATE**

**VIII.   STATE'S BURDEN TO SHOW THAT DEATH WAS THE APPROPRIATE SENTENCE IN THIS CASE**

**IX.     CLAIM OF MENTAL RETARDATION**

¶31.    Each of the Issues III - IX was raised on direct appeal and decided adversely to

Branch. *See* **Branch**, 882 So. 2d 36.[3]  With the exception of Branch's Issue IX,[4] these issues

_____

[3]Issue III, *Id.* at 67-68 (as Issue VIII);
Issue IV, *Id.* at 68-71 (as Issue IX);
Issue V, *Id.* at 72 (as Issue XI);
Issue VI, *Id.* at 71-72 (as Issue X);
Issue VII, *Id.* at 51-52 (as Issue II);
Issue VII A.1., *Id.* at 52-53(as Issue II. A.1.);
Issue VII A.2., *Id.* at 53 (as Issue II A.2.);
Issue VII A.3., *Id.* at 53-55 (as Issue II A.3.);
Issue VIII, *Id.* at 72-74 (as Issue XII); and,
Issue IX, *Id.* at 49-51(as Issue I.).


[4]Branch's argument on Issue IX of his Amendment to Petition for Post-Conviction Relief with Exhibits (beginning at page 3) is identical to the argument presented in his Original Brief of Appellant filed on direct appeal (beginning at page 3) with the exception

15

and their respective arguments presented in Branch's PCR are identical, almost verbatim, to the arguments presented in Branch's Original Brief of Appellant on direct appeal. Branch has not demonstrated a novel claim nor a sudden reversal of law relative to these issues which would exempt a single one of these claims from the procedural bar of res judicata pursuant to Miss. Code Ann. § 99-39-21(3) (Supp. 2006). *See also Lockett v. State*, 614 So. 2d 888, 893 (Miss. 1992) (citing *Rideout v. State*, 496 So. 2d 667 (Miss. 1986); *Gilliard v. State*, 446 So. 2d 590 (Miss. 1984)).

¶32. For the foregoing reasons, this Court finds that Lawrence Branch is not entitled to post-conviction relief; therefore, we deny Branch's Petition for Post Conviction Relief with Exhibits and his Amendment to Petition for Post-Conviction Relief with Exhibits.

¶33. **PETITION FOR POST-CONVICTION RELIEF WITH EXHIBITS AND AMENDMENT TO THE PETITION FOR POST-CONVICTION RELIEF WITH EXHIBITS, DENIED.**

**SMITH, C.J., WALLER, P.J., EASLEY, DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J.**

**DIAZ, PRESIDING JUSTICE, DISSENTING:**

¶34. Because Branch has presented sufficient evidence of mental retardation and because such a claim is not procedurally barred, I must dissent.

**I. Branch has Presented Sufficient Evidence of Mental Retardation.**

---

of the added citations to *Chase v. State*, 873 So. 2d 1013 (Miss. 2004). As discussed in Issue II, this claim is barred by the doctrine of res judicata. Miss. Code Ann. § 99-39-21(3) (Supp. 2006).

¶35. The majority's assertion that "Branch has not complied with the necessary procedures nor provided the necessary documentation to rightfully comply with our holding in *Chase*" does not comport with the record. The majority conveniently fails to mention two critical facts: (1) that Dr. Gant's affidavit states that Dr. Lott's previous assessment cannot be relied upon as a determination of mental retardation and (2) that Branch's most recent testing shows that he falls within the definition of mental retardation as defined by *Atkins*.

¶36. This Court previously relied on a report by Dr. Criss Lott which merely determined that Branch was competent to stand trial. Dr. Gant states in his affidavit that because the examination was aimed at determining competency, the report cannot be relied upon for determining mental retardation. Specifically, Dr. Gant finds the report insufficient to determine mental retardation because (1) Branch was given an abbreviated Wechsler Adult Intelligence Scale which can only give an estimated IQ; (2) there are a number of abnormalities in the test scores; and (3) the report did not assess the differences in the 1985 and 2002 test scores. Dr. Gant went on to say that, in his expert opinion, Branch was mentally retarded and had an IQ of 75 or below.

¶37. The majority also completely fails to mention that attached to Branch's petition is a report concluding that Branch "meets all criteria for a diagnosis of mental retardation." This report is a result of Dr. Marc Zimmerman's October 7, 2005, examination of Branch. According to his report, Dr. Zimmerman used the following assessment techniques to determine Branch was mentally retarded: clinical interview, Wechsler Adult Intelligence

17

Scale-III, Short Category Test, Screening Test for the Luria-Nebraska Neuropsychological Battery, and Wide Range Achievement Test-III.

¶38.    Branch has most certainly met the requirements of *Chase* as he has presented an expert who has "expresse[d] an opinion, to a reasonable degree of certainty" that: (1) Branch is mentally retarded as defined by the American Association on Mental Retardation and (2) he has completed multiple tests and is not malingering. *See Chase*, 873 So. 2d 1013, 1029 (Miss. 2004) (setting out these two requirements). By turning a blind eye to this evidence, this Court will be sanctioning the death of a potentially mentally retarded person. The United States Supreme Court made absolutely clear in *Atkins* that this is unconstitutional, and we must allow Branch the opportunity to pursue his *Atkins* claim in the trial court.

**II. Branch's *Atkins* Claim is Not Procedurally Barred.**

¶39.    Though not explicitly stated, by not considering this evidence the Court treats this issue as procedurally barred. As we reiterated in *Chase v. State*, 873 So. 2d 1013, 1023 (Miss. 2004), "[i]t is not our function to determine whether [the defendant] is mentally retarded." Rather, this Court simply decides whether a defendant has met certain requirements sufficient to remand the case for a factual determination by a trial court. Id.

¶40.    Branch has never been allowed the opportunity to comply with *Chase*, which is clearly an intervening decision. That decision specifically held "for defendants whose trials were held *prior to the publication of this opinion*, the affidavit as described above shall be attached to the defendant's application for post-conviction relief." *Id.* at 1029-30 (emphasis supplied). Branch attached such an affidavit to his motion for rehearing on direct appeal, but

18

it was stricken by this Court. Because we have never allowed Branch the opportunity to present a prima facie case for an *Atkins* claim, this issue is not procedurally barred.

¶41. I am further troubled by the finding of a procedural bar in this case where the State has attempted to prevent Branch from even receiving the requisite testing. In order for a medical professional to even examine the defendant, his post-conviction counsel was forced to obtain an order from the Carroll County Circuit Court allowing the psychologist to enter the prison. While the Mississippi Department of Corrections would allow Branch's counsel and a social worker to visit, it was their policy to require court orders for medical doctors. The trial judge at this hearing was rightly surprised that such an order was required and that the State of Mississippi was actually opposing the motion:

> **Court:** – Wait a minute. I'm not being asked to order a psychiatric evaluation, am I?
>
> **Defense:** No, sir.
>
> **Court:** I am just being ordered – you are asking for an order to let your guy go there to talk to them.
>
> **Defense:** To let us have a professional examine –
>
> **Court:** – retained by your office?
>
> **Defense:** Sir?
>
> **Court:** I mean I'm not even ordering payment or anything on that, am I?
>
> **Defense:** No, sir. There is not a request for county funds. We are available to do this particular one with funds from our office. But what I think is –

| | |
|---|---|
| **Court:** | – Let me see y'all's motion. |
| | (Document handed to the Court.) |
| **Court:** | Let me look at it, review it real quick. |
| | (Off the record briefly.) |
| **Court:** | Ms. Dotson, they are not asking me to order this. They are just asking for access to this person. What standing do y'all have to object to that, them having access to their client? |

¶42. I share the trial judge's concern. It is disturbing that the Department of Corrections would require a court order and that the State would oppose such a motion. In light of these obstacles, how can this Court expect a defendant to comply with a decision issued only one week before his direct appeal is decided?

## Conclusion

¶43. Because Branch has fulfilled the requirements of our decision in *Chase*, I would remand for an *Atkins* hearing.

**GRAVES, J., JOINS THIS OPINION.**