# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-KA-00203-SCT

*BILLY GIVENS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/02/2005 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS |
| COURT FROM WHICH APPEALED: | HUMPHREYS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF INDIGENT APPEALS |
| | BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | JAMES H. POWELL, III |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/30/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE SMITH, C.J., CARLSON AND RANDOLPH, JJ.

### CARLSON, JUSTICE, FOR THE COURT:

¶1.     Billy Givens was indicted, tried and found guilty by a Humphreys County jury of

murder and sentenced by the trial judge to life imprisonment.  Aggrieved by the judgment

of conviction and sentence, Givens appealed to this Court.  Finding no error, we affirm.

### FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.     On January 7, 2005, the Humphreys County Grand Jury handed down an indictment

charging Billy Givens with deliberate design murder in the killing of Robert Cooper by

hitting him in the head with a brick. On November 2, 2005, Billy Givens was tried before a jury in the Circuit Court of Humphreys County, Judge Jannie M. Lewis, presiding.

¶3. Belzoni Police Chief Mickey Foxworth testified that in the late-night hours of October 9, 2004, or in the early-morning hours of October 10, 2004, a call was received at the Belzoni Police Department that some drug activity was occurring on Lincoln and Judy Thurmond,[1] behind Smith Funeral Home. Foxworth testified that he reported to that area and, upon arriving, spotted Givens and Cooper, also known as "Black Pepper," together. Foxworth explained that after approaching Givens and Cooper, he searched both men, and found two "nickel bags" of marijuana on Givens. He also found a .22 pistol, which Cooper claimed belonged to him, under the porch of a house behind the funeral home. Shortly afterward, Foxworth left the scene and proceeded to patrol the downtown area of Belzoni. Approximately ten to fifteen minutes later, Foxworth returned to the area behind the funeral home to check on his officers. At that time, Foxworth spotted Givens standing on Cain Street looking at the ground. Foxworth testified he circled the block and then spotted Cooper lying on the ground on the side of the road, but Givens was gone. Realizing that Cooper was dead, Foxworth sent out a dispatch for officers to report back to the scene.

¶4. Belzoni police officer Cruron Grayson testified that he responded to a call from dispatch that drug activity was occurring at an abandoned house in the rear of Smith Funeral Home. Grayson stated that he gave a citation to Givens for the possession of marijuana, and

---

[1]Judy Thurmond is most commonly referred to throughout the transcript as Cain Street.

2

Givens walked off, throwing down the ticket. Grayson also reported to the second call sent out by Foxworth stating that someone was dead on Cain Street. Grayson was present when Annie Hampton and Sammy Foman, two eyewitnesses, were questioned. Grayson testified that, based on the statements of Hampton and Foman, Givens became a suspect.

¶5. Humphreys County Deputy Sheriff Kenny Terry testified that he arrived at the abandoned house behind Smith Funeral Home after the first report from dispatch. Terry saw Givens and Cooper, whom he recognized, with officers from the Belzoni Police Department. After Givens received the citation, Terry saw Givens start punching a wall and yelling that he was "set up." Deputy Terry also responded to the second dispatch by Foxworth, but did not participate in the investigation.

¶6. Lieutenant James White with the Belzoni Police Department (White was later promoted to Assistant Chief of Police) testified that he was called to the abandoned house during the first dispatch by Foxworth. Lt. White informed Foxworth that Cooper was a confidential informant for the Belzoni Police Department, but was not working that night. White also testified that he observed Givens being issued the citation for possession of marijuana and Givens got "very furious, got very mad, he threw the ticket on the ground. . . . I just observed him getting seriously mad." White was also at the scene for a second time that night to observe Cooper's body and to collect bricks with blood on them. The next day, White had the opportunity to interview Hampton and Foman and take their statements, since they said they had witnessed Cooper's death.

3

¶7.    At trial, Hampton was the first eyewitness to take the stand.  She testified that she had known Givens all of his life and had known Cooper for as long as she had lived in Belzoni. Hampton testified that on the night of October 9, or early-morning hours of October 10, she was sitting on the porch of an abandoned house on Cain Street with Foman when Cooper rode up to them on his bike.  According to Hampton, while Cooper was talking with Hampton and Foman, Givens came from behind and struck Cooper in the head with a brick. Hampton explained that Givens repeatedly hit Cooper in the head with a brick.  Hampton further testified that Givens told her and Foman that "y'all don't see nothing," whereupon Hampton and Foman ran to Irene Brown's house across the street.  Hampton also testified that she had glaucoma and could not see very well.

¶8.    The other eyewitness, Foman,[2] testified that he knew both Givens and Cooper and was sitting on the porch of an abandoned house on Cain Street with Hampton when Givens killed Cooper.  Foman stated that Givens came up from behind Cooper, while Cooper was speaking with Foman and Hampton, and hit Cooper in the head with a brick.  Foman  likewise stated that Cooper fell off his bike and Givens kept picking up bricks and hitting Cooper in the head.  Foman also testified that Givens stated, "y'all see anything, you say I didn't."  At that point, Foman and Hampton started running to Irene Brown's house.  Later that night, Foman gave a statement to White.  On cross examination, Foman was asked what Givens was

_____

[2]Throughout the record, Sammy Foman is also referred to as Sammy Foreman and Sammy Forman.

wearing that night and Foman replied, "I can't hardly see, it was dark. I don't know what he had on."

¶9. The final witness called by the State was Dr. Steven Hayne, a pathologist. Hayne testified that Cooper's "[c]ause of death was cranial cerebral trauma. That is, this individual had received multiple blows to the head, to the right side of the head as well as the facial area, including the forehead and about the right eye, as well as the nose." Hayne determined that the manner of death was homicide. Hayne also testified that Cooper did not have any defensive wounds to indicate that he fought back or tried to protect himself.

¶10. After the State rested its case-in-chief, Givens was fully advised by his counsel and the trial judge of his right to testify or not testify. The record shows that Givens made an informed decision not to testify, and the defense rested. After being instructed by the trial court as to the applicable law, which included instructions for both murder and manslaughter, the jury commenced its deliberations. After forty-five minutes, the jury returned a verdict, finding Givens guilty of murder. Judge Lewis thereafter sentenced Givens to a term of life imprisonment in the custody of the Mississippi Department of Corrections. It is from this judgment of conviction and sentence that Givens, through his court-appointed trial counsel, appealed to us.

¶11. Pursuant to *Lindsey v. State*, 939 So. 2d 742 (Miss. 2005), the Humphreys County public defender who had represented Givens at trial certified to this Court that he had scoured the record and found no arguable issues for appeal. In addition, Givens's trial counsel verified that he had informed Givens of his right to file a pro se brief. On appeal,

5

Givens filed a pro se brief asserting five issues including: (1) ineffective assistance of counsel; (2) violation of the due process clause of the Fourteenth Amendment; (3) perjury by all of the witnesses; (4) misidentification; and (5) prosecutorial misconduct. Consistent with *Lindsey*, this Court instructed the public defender to file a supplemental brief addressing the issues raised in Givens's pro se brief. Due to Givens's ineffective assistance of counsel claim, the public defender filed a motion to withdraw as counsel, which motion was granted by this Court. We then appointed the Mississippi Office of Indigent Appeals (OIA) to represent Givens, and that office timely filed a supplemental brief addressing all the issues raised by Givens in his pro se brief. The supplemental brief also raised two additional issues: (1) whether improper character evidence was introduced; and (2) whether the verdict of guilty of murder, as opposed to manslaughter, was supported by the evidence. The State likewise filed a supplemental brief in response to the OIA's supplemental brief.

¶12. In addressing these various issues, we will restate and reorder them for clarity in discussion.

## DISCUSSION

### I. INEFFECTIVE ASSISTANCE OF COUNSEL.

### II. VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.

¶13. We will address these two issues together. Givens claims that his trial counsel rendered ineffective assistance by: (1) failing to object to the eyewitness testimony of Hampton and Foman; (2) failing to question the local authorities as to why a line-up was not

6

performed; and (3) "undermin[ing]" Givens's line of defense in closing arguments. Because effective assistance of counsel is secured by the Sixth and Fourteenth Amendments to the United States Constitution, issues I and II have been combined for complete analysis. *Washington v. Strickland*, 693 F. 2d 1243, 1250 (5th Cir. 1982); *Berry v. State*, 345 So. 2d 613, 615 (Miss. 1977); *Argersinger v. Hamlin*, 407 U.S. 25, 92 S. Ct. 2006, 32 L. Ed. 2d 530 (1972); *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963).

¶14.    The test for ineffective assistance of counsel is well-settled:

> "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

*Branch v. State*, 2007 Miss. LEXIS 276, *19, ¶ 27 (May 17, 2007). Therefore, for Givens to prevail on his claim for ineffective assistance of counsel, Givens must demonstrate that counsel's performance was deficient and that the deficiency prejudiced the defense of the case. *Strickland*, 466 U.S. at 687.

> This Court looks at the totality of circumstances to determine whether counsel's efforts were both deficient and prejudicial. "Judicial scrutiny of counsel's performance [is] highly deferential." There is a strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Only where it is reasonably probable that but for the attorney's errors, the outcome of the trial would have been different, will we find that counsel's performance was deficient.

*Walker v. State,* 863 So. 2d 1, 22 (Miss. 2003) (citing *Russell v. State*, 849 So. 2d 95, 122 (Miss. 2003) (quoting *Holly v. State*, 716 So. 2d 979, 989 (Miss. 1998)).

7

¶15. As stated *supra*, there is a rebuttable presumption that counsel's performance was effective. *Id.* "[C]ounsel's choice of whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections fall[s] within the ambit of trial strategy." *Cole v. State*, 666 So. 2d 767, 777 (Miss. 1995) (citing *Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984)). We find nothing in the record affirmatively showing constitutional ineffectiveness. Furthermore, Givens has failed to show prejudice. Thus, Givens has failed to meet his *Strickland* burden and we find these two issues to be without merit.

### III. PERJURY BY ALL OF THE WITNESSES

¶16. Givens next claims that the State knowingly presented perjured testimony from all seven witnesses. In addition, Givens submitted a diagram of the crime scene in an effort to contradict Foxworth's testimony.

¶17. Addressing the diagram first, it is not a part of the record on the appeal and we therefore need not consider it. *Saucier v. State*, 328 So. 2d 355, 357 (Miss. 1976) ("A reviewing court can act only on the basis of the contents of the official record. . . .")).

¶18. Regarding Givens's assertion that the State knowingly presented perjured testimony from all of its witnesses, Givens's court-appointed appellate counsel stated in its brief that it considers Givens's recitation of facts under this issue to create more of a claim of conflicting evidence or conflicting views of the evidence, or weight and sufficiency of the evidence rather than perjured testimony. Givens offered no evidence at trial to demonstrate that the State offered perjured testimony. Instead, Givens makes only assertions that the seven witnesses were lying, based on statements made in open court. However, mere

8

assertions are not sufficient to support a claim of perjury. ***Manning v. State***, 884 So. 2d 717, 726 (Miss. 2004). This issue is thus without merit.

### IV.   MISIDENTIFICATION

¶19.   Next, Givens asserts that his conviction is based on misidentification by Hampton and Foman.  Essentially, Givens gives a detailed analysis as to the five factors outlined in ***Neil v Biggers***, 409 U.S. 188, 199-200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), which a trial court should consider in determining whether an in-court identification has been impermissibly tainted by law enforcement investigatory identification procedures.  These five factors include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of confrontation; and (5) the length of time between the crime and the confrontation. ***Id.***  Since the trial judge was in a position to adequately assess these five factors and "[w]e will only disturb the order of the trial court where there is an absence of substantial credible evidence supporting it[,]" we find this issue also to be meritless.  There is substantial credible evidence to support the identification of Givens as Cooper's killer. ***Outerbridge v. State***, 947 So. 2d 279, 282 (Miss. 2006).  Both Hampton and Foman had an opportunity to watch Givens repeatedly hit Cooper in the head with multiple bricks.  While Foman admitted that it was dark outside and there was inadequate lighting, which caused him to be unable to describe Givens's clothing that night, Foman had known Givens his entire life.  In addition, during the trial, Hampton testified she had glaucoma, but she also had known Givens his entire life.  Both witnesses

9

were certain that Givens was who man who killed Cooper. Neither witness wavered from his or her original statement identifying Givens. The jury was properly instructed on how it was to consider the identification testimony. The jury, by its verdict, obviously believed that the identification testimony of Hampton and Foman, when considered with all the other evidence, was credible.

> Jurors are permitted, indeed have the duty, to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject, the utterances of any witness. No formula dictates the manner in which jurors resolve conflicting testimony into findings of fact sufficient to support their verdict. That resolution results from the jurors hearing and observing the witnesses as they testify, augmented by the composite reasoning of twelve individuals sworn to return a true verdict. A reviewing court cannot and need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict. It is enough that the conflicting evidence presented a factual dispute for jury resolution.

*Jones v. State*, 920 So. 2d 465, 472-73 (Miss. 2006) (citing *Jackson v. State*, 614 So. 2d 965, 972 (Miss. 1993)). The trial judge instructed the jury via instruction number six concerning the identification evidence, as follows:

> The Court instructs the Jury that in reaching your verdict you are to consider all of the evidence concerning the entire case and the circumstances surrounding the crime. One of the issues in this case is the identification of Billy Givens as the perpetrator of the crime. As with each element of the crime charged, the State has the burden of proving identity beyond a reasonable doubt, and before you convict Billy Givens you must be satisfied beyond a reasonable doubt of the accuracy of the identification of Billy Givens. If, after considering all of the evidence concerning the crime and the witness' identification of Billy Givens as the person who committed the crime, you are not convinced beyond a reasonable doubt that he is the person who committed the crime, then you must find him not guilty.
>
> Identification testimony is an expression of belief or impression by the witness. You must judge its value and reliability from the totality of the

10

circumstances surrounding the crime and the subsequent identification. In appraising the identification testimony of a witness, you should consider the following:

1) Did the witness have an adequate opportunity to observe the offender?
2) Did the witness observe the offender with an adequate degree of attention?
3) Did the witness provide an accurate description of the offender after the crime?
4) How certain is the witness of the identification?
5) How much time passed between the crime and the identification?

If after examining all of the testimony and the evidence, you have a reasonable doubt that Billy Givens was the person who committed the crime, then you must find Billy Givens not guilty.

Thus, taking the totality of the record before us, we are unable to find that the trial judge abused her discretion by allowing the in-court identification of Givens by Hampton and Foman. *Outerbridge*, 947 So. 2d at 282 (citing *Johnston v. State*, 567 So. 2d 237, 238 (Miss. 1990)). This issue therefore is without merit.

## V.  PROSECUTORIAL MISCONDUCT

¶20.    While in his pro se brief, Givens asserts the issue of prosecutorial misconduct, Givens does not further address the issue. Givens's appellate counsel states: "[Givens's claim] could be assumed to be connected to the claim of presenting alleged perjured testimony. Otherwise, the undersigned counsel, upon scouring the record, cannot determine any matter to address for the court under this claimed issue." When a party on appeal assigns an error without any citation to authority, this Court will deem this failure to cite any authority as a procedural bar. *Turner v. State*, 721 So. 2d 642, 649 (Miss.1998) (citing *McClain v. State*,

11

625 So. 2d 774, 781 (Miss. 1993)). Procedural bar notwithstanding, because we have found

the perjury issue discussed in issue III, *supra*, to be without merit, this issue is likewise

lacking of any merit.

### VI.    IMPROPER CHARACTER EVIDENCE

¶21.    Givens's appointed appellate counsel raised the issue of whether improper character

evidence was introduced.  Appellate counsel contends that Givens's trial counsel could have

objected to the introduction of evidence of other criminal activity involving Givens pursuant

to Miss. R. Evid. 404(b).  Particularly, appellate counsel states that potentially objectionable

evidence at trial consisted of:  (1) the initial call to the police about drug activity occurring

behind the Smith Funeral Home and drugs being found in the possession of Givens, and (2)

that the police were familiar with Givens because of past juvenile matters.

¶22.    Mississippi Rule of Evidence 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the
> character of a person in order to show that he acted in conformity therewith.
> It may, however, be admissible for other purposes such as proof of motive,
> opportunity, intent, preparation, plan, knowledge, identity, or absence of
> mistake or accident.

The comments under Rule 404(b) further provide that the "exceptions listed in Subsection

(b) are not exclusive.  Miss. R. Evid. 404(b) *Cmt*.  This Court stated in ***Palmer v. State***, 939

So. 2d 792, 795-96 (Miss. 2006),

> The general rule is that evidence of a crime, other than the one for which the
> accused is being tried, is not admissible. ***Ballenger v. State***, 667 So. 2d 1242,
> 1256 (Miss. 1995) (citing ***Duplantis v. State***, 644 So. 2d 1235, 1246 (Miss.
> 1994)).  However, there are exceptions to this general rule as provided by
> Miss. R. Evid. 404(b). . . .

This Court has consistently held the admission of evidence of unrelated crimes for the purpose of showing the accused acted in conformity therewith is reversible error, but admission for the above reasons [motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident] is permissible. *Ballenger*, 667 So. 2d at 1256.

Evidence of other crimes or bad acts is also admissible in order to tell the complete story so as not to confuse the jury. In *Brown v. State*, 483 So. 2d 328, 330 (Miss. 1986), this Court said the State has a "legitimate interest in telling a rational and coherent story of what happened." Where substantially necessary to present to the jury "the complete story of the crime," evidence of testimony may be given even though it may reveal or suggest other crimes. *Simmons v. State*, 813 So. 2d 710, 716 (Miss. 2002); *Ballenger*, 667 So. 2d at 1257.

¶23. In this case, Givens's appointed trial counsel made no objection to this evidence at trial. Based on the record before us, we can readily understand why defense counsel would not object. Certainly the testimony from law enforcement officials as to their being alerted to drug activity in the area was proper Rule 404(b) evidence because it told the jury "the whole story" as to why Belzoni police officers and a Humphreys County deputy sheriff went to the scene, where they happened upon Givens. We recently stated that to hold certain evidence to be inadmissible solely because it is evidence of a prior bad act "would be to hamstring the State in the presentation of the complete story" to the jury concerning the crime for which the defendant is on trial. *Jones v. State*, 920 So. 2d 465, 475 (Miss. 2006).

¶24. However, once the Rule 404(b) criteria have been met, "this otherwise admissible evidence must still survive the required balancing test pursuant to the provisions of Miss. R. Evid. 403." *Id.* As we further stated in *Jones*:

Accordingly, just as with any evidence otherwise admissible under any other evidentiary rule, evidence which is deemed admissible pursuant to Rule 404(b)

13

may still be excluded if its probative value is substantially outweighed by the danger of its resultant unfair prejudice. This Court has consistently recognized the broad sweeping effect of Rule 403:

> To be sure, evidence admissible under Rule 404(b) is also subject to the prejudice test of Rule 403; that is, even though the Circuit Court considered the evidence at issue admissible under Rule 404(b), it was still required by Rule 403 to consider whether its probative value on the issues of motive, opportunity and intent was substantially outweighed by the danger of unfair prejudice. In this sense Rule 403 is an ultimate filter through which all otherwise admissible evidence must pass. *Watts*, 635 So.2d at 1368 (quoting *Jenkins v. State*, 507 So.2d 89, 93 (Miss. 1987)). Consequently, "[t]his rule necessarily vests in the Circuit Court a certain amount of discretion." *Hart v. State*, 637 So.2d 1329, 1336 (Miss. 1994) (quoting *Stokes v. State*, 548 So.2d 118, 125 (Miss. 1989)).

*Id.* at 475 (quoting *Hoops v. State*, 681 So. 2d 521, 530-31 (Miss. 1996)). When considering this "other crime" evidence concerning drug activity occurring behind the Smith Funeral Home and drugs being found in the possession of Givens, as well as the fact that the police were familiar with Givens because of past juvenile matters, we are convinced that the probative value of this relevant evidence was not substantially outweighed by danger of unfair prejudice, and thus the trial judge did not abuse her discretion in allowing it. Keeping in mind that Givens's trial counsel made no objection to this evidence, we agree with Givens's appellate counsel "that there was no error nor ineffectiveness of counsel under this topic to raise for appellate review." We thus find this issue to have no merit.

14

## VII. VERDICT SUPPORTED BY THE WEIGHT OF THE EVIDENCE

¶25. The other issue raised by appellate counsel is that the verdict of murder was not supported by the evidence and if the jury was justified in finding Givens guilty of any crime, it should have found him guilty of manslaughter. Appellate counsel admits sufficient evidence was presented at trial to show that Givens acted in the heat of passion, taking his acts out of the realm of murder. Specifically, appellate counsel states that the record supports the argument that Givens thought Cooper had set him up. Investigating officers for the State testified that Givens received a citation for his possession of marijuana and began yelling that he was set up and hitting a wall.

¶26. The standard of review for determining whether a jury verdict is against the overwhelming weight of the evidence is well-settled. We will not order a new trial "unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice." *McLendon v. State*, 945 So. 2d 372, 385 (Miss. 2006) (citing *Groseclose v. State*, 440 So. 2d 297, 300 (Miss. 1983)); *see also* *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005) (citing *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997)).

¶27. To support his argument that the jury's verdict of murder is not supported by the weight of the evidence, and at best, the evidence would support a guilty verdict for manslaughter, appellate counsel cites several cases, including *Tait v. State*, 669 So. 2d 85 (Miss. 1996); *Dedeaux v. State*, 630 So. 2d 30 (Miss. 1993); and, *Clemons v. State*, 473 So.

15

2d 943 (Miss. 1985). Both *Dedeaux* and *Clemons* relied, in part, on this Court's prior decision in *Wells v. State*, 305 So. 2d 333 (Miss. 1974). However, *Tait*, *Dedeaux*, *Clemons*, and *Wells* are all clearly distinguishable from today's case. We will briefly discuss these cases in chronological order, based on the dates of the decisions.

¶28. In *Wells*, there were no eye witnesses to the killing, but the defendant stated that he confronted an intoxicated man at a "juke joint" about cursing his (the defendant's) wife, whereupon the man hollered, "Come on, I am going to get you," and then grabbed the defendant by his throat. The defendant reacted by pulling his knife and putting the knife to the aggressor's throat "to scare him," but, according, to the defendant, he accidently cut the man's throat, killing him. On appeal, this Court found that the murder conviction was not supported by the evidence, but that the evidence did support a manslaughter conviction; therefore, the case was remanded for resentencing for the crime of manslaughter. *Wells*, 305 So. 2d at 337, 340.

¶29. *Clemons* involved another "juke joint" killing where there was considerable consumption of alcohol. The defendant was found guilty of murder; however, on appeal, this Court stated that there were so many contradictory versions of what occurred on the night in question, it was virtually impossible for the jury to reasonably "extrapolate enough competent facts from the many versions of the story to sufficiently support the finding of murder." *Clemons*, 473 So. 2d at 945. Therefore, consistent with *Wells* and other cited cases, this Court found that "the evidence has established guilt of [manslaughter] beyond a

16

reasonable doubt," and the case was remanded for resentencing for the crime of manslaughter. *Id.*

¶30.    The setting in *Dedeaux* involved yet another "juke joint" killing where a married woman's lover killed the woman's highly intoxicated husband.  This Court found that while the intoxicated husband was most likely the aggressor, the confrontation between the defendant and his girlfriend's husband "was arguably initiated by [the defendant]." *Dedeaux*, 630 So. 2d at 31.  In due course, several shots were fired and the intoxicated husband was killed.  The defendant was convicted of murder and on appeal, this Court found that the case was "weak" as to murder; therefore, consistent with *Wells and Clemons*, this Court reversed and remanded for resentencing for the crime of heat-of-passion manslaughter. *Id.* at 33.

¶31.    Finally, in *Tait*, the defendant and his friend had been playing in the yard with a pistol for most of the day, when the defendant put the pistol to his friend's head and the pistol fired, killing the defendant's friend.  The defendant immediately fell to the ground and began crying.  When a police officer responded to the scene, he entered an apartment, finding one male with a serious head wound, and the other male (the defendant), holding his friend's head, "sobbing and saying, 'I killed him. Oh my God, I killed him.  I shot him.'" *Tait*, 669 So. 2d 85. Relying on *Wells*, *Clemons*, and *Dedeaux*, this Court found that the evidence did not support a conviction for depraved heart murder or for heat-of-passion manslaughter, but that the evidence did support a conviction for manslaughter by culpable negligence;

17

therefore, the case was remanded for resentencing for the "lesser offense of culpable negligence manslaughter." *Id.* at 91.

¶32. All these cases are readily distinguishable from today's case since *Wells*, *Clemons*, and *Dedeaux* involved emotionally-charged environments brought about by a combination of alcohol consumption and jealousy, and *Tait* involved the unfortunate killing of a friend by a person who became immediately distraught over what he had done. In today's case, although Givens may have been upset with Cooper for being allegedly "set up" for the marihuana possession charge, eyewitness testimony from Hampton and Foman reveals that while Cooper was sitting on his bicycle talking to them, Givens came up from behind and repeatedly hit Cooper in the head with a brick. According to Foman, even after Cooper fell off his bicycle, Givens kept picking up bricks and hitting Cooper in the head. According to Hampton, after the incident, Givens told Hampton and Foman "y'all don't see nothing." According to Foman, Givens told them, "y'all see anything, you say I didn't."

¶33. Viewing the evidence in the light most favorable to the verdict, we cannot say that the verdict of guilty of depraved heart murder was so contrary to the overwhelming weight of the evidence that to allow it to stand would be an unconscionable injustice. Further, this Court is unable to say that the evidence against Givens was insufficient to uphold his murder conviction. In *Mullins v. State*, 493 So. 2d 971, 974 (Miss. 1986), we defined "heat of passion" as follows:

> In the criminal law, a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly

18

aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.

*Id.* (citing ***Black's Law Dictionary***, 650 (5th Ed. 1979)).

¶34. When considering the evidence in the light most favorable to the State, a rational juror could conclude that Givens acted not out of the heat of passion, but with deliberate design to kill Cooper. The evidence showed that Givens repeatedly hit Cooper with multiple bricks; that he stopped during the attack to tell Hampton and Foman that it would be best for them if "they had not seen anything;" that Givens struck Cooper from behind; and that Cooper had no defensive wounds on his hands. While Givens was possibly angry because he thought that the drug bust was a set-up by Cooper, Givens did not act in a "violent and uncontrollable rage. . . ." ***Mullins***, 493 So. 2d at 974. Several officers testified that Givens had walked away yelling. Givens had plenty of time to contemplate hitting Cooper; and thus, a jury could find that Givens acted with deliberate design. The jury had all the evidence before it and made an informed decision based on the facts before it. Thus, this issue lacks merit.

## CONCLUSION

¶35. For the reasons stated, the Humphreys County Circuit Court's judgment of conviction of murder and sentence of life imprisonment entered against Billy Givens for the murder of Robert Cooper is affirmed.

¶36. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

19

SMITH, C.J., WALLER AND DIAZ, P.JJ., EASLEY, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY.