CARLSON, Presiding Justice,
 

 for the Court:
 

 ¶ 1. Damien Anderson, also known as Damien Wise, was convicted of murder by the Circuit Court of Holmes County, Mississippi, in an action arising from the homicide of Darnell “Sporty” Smith. Anderson contends that the circuit court erred when it refused to grant a jury instruction on the lesser-included offense of manslaughter. Anderson states that the trial court improperly forced the defense to choose between manslaughter and self-defense instructions. However, because no reasonable jury could have found the defendant guilty of the lesser-included offense, we find no error and affirm the judgment of the circuit court.
 

 FACTS AND PROCEEDINGS IN THE TRIAL COURT
 

 ¶ 2. On the night of August 16, 2009, Smith and Anderson were present at the Barnyard Club located on Bowling Green Road in Durant in Holmes County. Whether Smith and Anderson engaged in a verbal altercation is in dispute. Whether Smith gestured as if he were going to reach for a gun is also in dispute. Smith was then shot several times and died of the wounds received. In a statement to Durant police, Anderson confessed to at least some of these shootings. Both Smith and Anderson were legally intoxicated at the time of Smith’s death.
 

 ¶ 3. On or about December 8, 2009, Anderson was indicted for the murder of Smith. The case was tried on May 10-11, 2010. Several witnesses testified, but the defense called only one witness, Tiffany Owens. Owens was not cooperative with defense counsel, and the defense moved for Owens to be treated as a hostile wit
 
 *503
 
 ness, but this request was denied. In addition, Anderson, who did not testify at trial, submitted to questioning from Durant police following his arrest and after being read his
 
 Miranda
 
 rights.
 
 See Miranda v. Arizona,
 
 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Captain Sam Chambers of the Holmes County Sheriffs Department read portions of his statement at trial.
 

 ¶ 4. Police interviewed Anderson on August 19, 2009. In that interview, Anderson contradicted himself repeatedly. Initially, Anderson said that, as patrons departed the club to watch a fight, Smith bumped into him, went for a gun, and then “he got shot.” Anderson denied shooting Smith. When asked if he and Smith had had a longtime vendetta against each other, Anderson responded, “something like that, yeah.” Captain Chambers noted at trial that he had asked Anderson about a “vendetta” with Smith because of “something going on between Goodman and Durant, young men.” He explained of these two groups of men, “[t]he ones that I don’t have in jail, they’re in prison. The ones that are not in prison is [sic] paralyzed.”
 

 ¶ 5. In the same interview, Anderson admitted to having shot Smith one time. Shortly thereafter, however, Anderson claimed that he never shot Smith, and that his admission had been a mistake. Pressed further, Anderson said, “I shot one time. I don’t know how many times I shot. I’m gone [sic] say it like that. I don’t know how many times.” Anderson then commented that he “was just shooting toward his way.” Anderson claimed that Smith had pulled a gun on him at the Barnyard before and that he “can’t take it from him no more,” and then revealed a history of mutual antagonism between the two of them that arose when Smith got into a fight with Anderson’s cousin, in Chicago.
 

 ¶ 6. Anderson was asked how many guns he saw, and he indicated “a bunch of guns,” and when asked to clarify, answered, “I’ll just say his, I guess.” Anderson said he didn’t know what type of gun he had used to shoot Smith, since he “got the gun off the ground.” Anderson said that he was brought to the club by a female, but that because he was tipsy, his memories were blurry, and he did not remember the female’s identity. Anderson then claimed to have shot Smith four times.
 

 ¶ 7. Lastly, Anderson claimed that he and Smith had had “a few words” outside the club, and that after this confrontation, Anderson had shot Smith because he thought Smith was about to shoot him. Captain Chambers stated at trial that he calculated that Anderson had changed his story “[t]hree or four times” during the interview.
 

 ¶ 8. Dr. Annie Gruszecki, a forensic pathologist, testified at trial that Smith had died of ten gunshot wounds. While she indicated that some of the shots, especially one to the brain and another to the abdomen, were especially likely to have been fatal, she indicated that all ten of the gunshot wounds “[were] potentially fatal, some more immediately so than others.” One of those wounds was surrounded by soot. Dr. Gruszecki testified that this meant the bullet was fired at Smith from no more than two inches away, and as close as actual contact. One of the shots was a medial shot, which indicated that either the shooter was standing above Smith or Smith was lying down when that shot was fired. Dr. Gruszecki also testified that Smith had a high blood-alcohol content at the time of his death.
 

 ¶ 9. An eyewitness, Kelcey Winters, who was called for the State, testified that he was standing outside the club and saw someone hand Anderson a gun. When
 
 *504
 
 Smith exited the club, Winters observed Anderson “just [run] on and [start] shooting.” Winters noted that just before this incident, an unrelated commotion had occurred outside. Winters said that Anderson was about two or three feet from Smith when he first pulled the trigger. To Winters, it appeared that Smith “had threw [sic] his hands up as to say like ‘stop’ or ‘hold, wait.’ And [Anderson] shot him[.]” Thereafter, Winters ran for cover, but “heard rapid fire, just like numerous shots[.]” Winters said that Smith did not have a weapon, and that the club from which Smith had just exited had checked patrons for weapons by patting them down. Winters heard no conversation or argument between Anderson and Smith before the shooting, and did not see any apparent exchange of words, although he was looking at them.
 

 ¶ 10. Another eyewitness called by the State, Nathaniel Foster, had a slightly different perception of events. In contrast to Winters, Foster observed Smith outside the club before the shooting and saw Anderson coming out of it. He saw Smith and Anderson “having words with each other.” When asked if cursing or screaming was involved, Foster said “[i]t looked like ... [Smith] was kind of backing up, and they were still talking to each other.” Foster testified that he turned away before the shooting began “[b]ecause it looked like something just wasn’t going right,” and that he wanted to alert others. Foster testified that he “had been around too many things. Well, people get to moving around, and I can tell something ain’t right.” Afterward Foster heard gunshots. The next time Foster saw Smith, his body was slumped over. When asked if he knew whether Smith and Anderson got along, Foster, who characterized himself as Smith’s best friend, stated “I guess not.”
 

 ¶ 11. Donald Lee Winters (Donald) accompanied Nathaniel Foster to the Barnyard Club. Donald observed Smith and Anderson “arguing ... having words as we walked up to the building.” He continued: “And I think [Foster] had brought to my attention that something was going on, because I really didn’t think it was anything serious, and the next thing I know, I saw the gun shoot.” Donald later characterized this incident as an “argument, conversation, I mean heated argument, I guess. I don’t know.” Donald saw the shooter and identified him as “the young man ... who I later found out was the defendant.” Donald believed that Anderson was three to five feet away from Smith when he began shooting. He heard “maybe about eight, nine” gunshots and characterized the them as rapid-fire. As the shooting began, Donald saw Smith “motionf ] like he was ducking and trying to run.” Donald did not believe that Smith exhibited any conduct indicating that he was carrying a weapon.
 

 ¶ 12. Another eyewitness, Jerry Bank-head, Jr., testified that he saw Anderson shoot Smith. Asked about Smith’s behavior during the incident, Bankhead testified that it “look[ed] like he was backing up, trying to get back.” When asked whether any arguing took place prior to the shooting, Bankhead responded “[n]ot that I know of. That’s why I didn’t think nothing [sic] was going on. I didn’t see nobody [sic] arguing.” Bankhead did admit that Smith “looked like he had been drinking.” Bankhead ran when the shooting began, but heard “a shot. And then it was like a pause and a couple of more shots.” After Bankhead’s memory was refreshed with his interview with Durant police, Bank-head recalled describing the shooting in this way: “He walked dead up on him and shot him.” Bankhead recalled the first shot being “[i]n the face. Right in the face. I know that it had to have been in
 
 *505
 
 the face, because he had pointed it dead in his face when he first shot.”
 

 ¶ 13. The defense called only one witness at trial, Tiffany Owens. Defense counsel requested the trial court to allow the defense to treat Owens as a hostile witness, but the request was denied. While it is difficult to judge Owens’s tone from the transcript, defense counsel stated to the court that, “due to her attitude when I’m asking her these questions, it’s obvious that she has a problem responding to my questions.” Smith was the alleged father of Owens’s child. However, at the time of his death, Smith had denied paternity of this child. Owens was asked by police not to attend Smith’s funeral since “[she] and [Smith’s] baby’s mama got in a fight.” Owens was also Anderson’s cousin.
 

 ¶ 14. Owens testified at trial that Smith and Anderson “passed a couple of words; [Smith] was reaching but he never put his hand in his pocket or nothing [sic].” Asked to clarify her comment as to the “reaching,” Owens elaborated: “[h]e was reaching. I didn’t say he was reaching for a gun in my statement. He was just reaching down. He never pulled anything out.” The defense attempted to impeach Owens with her own statement. In her statement, Owens said that “[Anderson] and [Smith] had words. It didn’t last long. [Smith] kept acting like he was fixing to reach for a gun, but he never pulled it out. So [Anderson] shot first.” On redirect, Owens added that she had “never known him to carry no [sic] gun.”
 

 DISCUSSION
 

 ¶ 15. The sole issue before us on appeal is whether the trial court erred in denying D-9 and D-10, the defense’s proposed lesser-included-offense jury instructions for manslaughter on Anderson’s murder charge.
 

 [An] instruction should be granted unless the trial judge — and ultimately this Court — can say, taking all the evidence in the light most favorable to the accused and considering all reasonable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser included offense (and conversely not guilty of at least one essential element of the principal charge.)
 

 Mease v. State,
 
 539 So.2d 1324, 1330 (Miss.1989) (citation omitted). In reviewing the record,
 

 [W]e initially are to ascertain whether “some” evidence existed to support the instruction requested.... If this Court is able to identify some evidence in support of the instruction, this Court is not called upon to weigh this evidence with regard to the jury’s verdict.... Rather, when viewing this evidence, this Court must find that an evidentiary basis existed for the instruction unless “taking the evidence in the light most favorable to the accused, and considering all reasonable favorable inferences that may be drawn from the evidence in favor of the accused, that no hypothetical jury could find the fact as the accused suggests.”
 

 Williams v. State,
 
 53 So.3d 734, 741 (Miss.2010),
 
 reh’g denied
 
 Feb. 24, 2011 (citing
 
 Anderson v. State,
 
 571 So.2d 961, 964 (Miss.1990)) (citations omitted).
 

 ¶ 16. Where there exists a claim that a defendant “was entitled to a lesser-included offense instruction, we conduct de novo review, as this is a question of law.”
 
 Downs v. State,
 
 962 So.2d 1255, 1258 (Miss.2007).
 

 ¶ 17. An indictment for murder includes the lesser-included charge of manslaughter.
 
 State v. Shaw,
 
 880 So.2d 296, 304 (Miss.2004).
 
 See also
 
 Miss.Code. Ann. § 99-7-37(2) (Miss.2007). However, a man
 
 *506
 
 slaughter instruction should be refused when the evidence supports only a verdict of murder.
 
 Ruffin v. State,
 
 444 So.2d 839, 840 (Miss.1984). Manslaughter is defined as “[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense.... ” Miss.Code Ann. § 97-3-35 (Rev.2006).
 

 ¶ 18. Heat of passion is defined as “[pjassion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.”
 
 McCune v. State,
 
 989 So.2d 310, 319 (Miss.2008) (citing
 
 Agnew v. State,
 
 783 So.2d 699, 703 (Miss.2001)). Nevertheless, “[m]ere words, no matter how provocative, are insufficient to reduce an intentional and unjustifiable homicide from murder to manslaughter.”
 
 Phillips v. State,
 
 794 So.2d 1034, 1037 (Miss.2001) (citing
 
 Gates v. State,
 
 484 So.2d 1002, 1005 (Miss.1986)). Allegations of self-defense do not necessarily negate the applicability of the lesser-included-offense instruction of manslaughter.
 
 Hester v. State,
 
 841 So.2d 158, 160 (Miss.Ct.App.2002).
 

 ¶ 19. In today’s case, in denying the proposed lesser-included manslaughter instructions, the trial judge stated, “I take it that you are-I granted the self-defense instruction, so I take it you are going with self defense.... Or do you want to go with manslaughter?” Anderson correctly points out that allegations of self-defense do not negate the applicability of the lesser-included-offense instruction of manslaughter. This Court has determined that the options of whether a defendant was “completely exonerated because of a legitimate threat to him, or whether his reaction to events was still criminal but lessened by the heat-of-passion, are not self-cancelling....”
 
 Hester,
 
 841 So.2d at 161. It has been and remains the law in this state that manslaughter and self-defense instructions are not mutually exclusive, and trial courts should not imply otherwise. Nevertheless, we still must determine whether there was sufficient evidence, when viewed in the light most favorable to the accused and considering all reasonable inferences which may be drawn in favor of the accused, for a reasonable jury to find the defendant guilty of the lesser-included offense, but not of the principal charge.
 
 See Mease,
 
 539 So.2d at 1330.
 

 ¶ 20. Anderson alleges that the trial court erred when it refused to grant a lesser-included-offense instruction for manslaughter on the murder charge, since he claims that three witnesses testified that Anderson and Smith had engaged in a heated argument prior to the shooting. Two witnesses did testify to some verbal altercation before the shooting. Donald Winters observed the two “pass a couple of words,” and Foster observed the two having “a word, a verbal altercation with each other.” Owens testified that the two “passed a couple of words.” In addition, Anderson gave a statement to police, parts of which were read at trial by Captain Chambers, also alleging that he and Smith had “a few words” prior to the shooting. However, this Court has long held that “mere words, no matter how provocative, are insufficient to reduce an intentional and unjustifiable homicide from murder to manslaughter.”
 
 Gates,
 
 484 So.2d at 1005.
 

 ¶ 21. In addition to the alleged argument, the only evidence Anderson presents to support his manslaughter contention is the allegation that Smith drew a gun on him. This was the core of the self-defense claim that failed to persuade the jury. Only two witnesses testified that
 
 *507
 
 Smith attempted to pull a gun before Anderson shot, and both of these witnesses contradicted themselves. Anderson claimed at various points in his statement that Smith had pulled a gun on him the night of the shooting; that Smith had pulled a gun on him on a previous night; that several people had pulled guns on him before the shooting; and, when pressed as to how many guns he saw, responded “I’ll just say [Smith’s], I guess.” This evidence supports a claim of self-defense, and the trial court granted a self-defense instruction.
 

 ¶ 22. Owens was impeached with her prior statement, in which she claimed that “[Smith] kept acting like he was fixing to reach for a gun, but he never pulled it out.” However, she declined to repeat this testimony at trial and testified that Smith never carried a gun. No other witnesses to the shooting testified that Smith had attempted to draw a weapon on Anderson. Anderson admitted to the police that he used had a firearm, and all eyewitnesses, including the sole defense witness, Owens, also alleged that Anderson had used a firearm. “We have held that ‘malice, or deliberate design, may be inferred from use of a deadly weapon.’ ”
 
 Phillips,
 
 794 So.2d at 1037 (citing
 
 Carter v. State,
 
 722 So.2d 1258, 1263 (Miss.1998)).
 

 ¶ 23. Anderson compares his case to
 
 Ruffin v. State,
 
 in which this Court found reversible error where the trial court failed to give a lesser-included-offense instruction after two independent witnesses testified that they had observed the defendant and victim arguing prior to the shooting.
 
 Ruffin,
 
 444 So.2d at 840. However, this reliance is misplaced. The Court in that case based its reversal on
 
 Martin v. State,
 
 112 Miss. 365, 73 So. 64, 65-66 (1916), which held that, where the occurrence was in the nature of a fight between two persons in a heated atmosphere, and one is killed by the other, the accused is entitled to permit the jury to consider the lesser-included charge of manslaughter.
 
 Martin,
 
 73 So. at 65-66. In
 
 Ruffin,
 
 the defendant and victim did more than argue; the defendant testified that the victim slapped him and attempted to take his firearm.
 
 Ruffin,
 
 444 So.2d at 840. That case is not analogous to the present situation.
 

 ¶ 24. Therefore, the trial court’s failure to grant a manslaughter jury instruction was not error. Mere words, however provocative, will not reduce an intentional and unjustifiable homicide from murder to manslaughter.
 
 Phillips v. State,
 
 794 So.2d at 1037. Malice, a necessary element of murder but not of manslaughter, may be inferred from the use of a deadly weapon.
 
 Id.
 
 The evidence that Smith drew a gun on Anderson could not persuade the trial jury that Anderson acted in self-defense. The only witnesses who claimed that Smith had pulled a gun were Anderson himself (though he contradicted himself in the same statement), and Owens, in a statement that she contradicted in her trial testimony. Given these facts, taking all the evidence in the light most favorable to the accused and considering all reasonable inferences which may be drawn in favor of the accused from the evidence, we find that no reasonable jury could have found Anderson guilty of manslaughter rather than murder.
 

 ¶ 25. For the reasons discussed, the sole issue before us has no merit.
 

 CONCLUSION
 

 ¶ 26. This Court’s longstanding precedent that self-defense and manslaughter instructions are not self-cancelling remains correct and binding. However, the evidence that Anderson was guilty of manslaughter, rather than murder, even when viewed in the light most favorable to the
 
 *508
 
 accused and considering all reasonable inferences, was insufficient to persuade any reasonable jury, and therefore did not mandate the granting of a manslaughter instruction. Mere words will not suffice to reduce murder to manslaughter, and malice may be inferred by Anderson’s use of a deadly weapon. As a result, the trial court did not err in denying instructions D-9 and D-10, the defense’s proposed lesser-included-offense jury instructions.
 

 ¶ 27. CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.
 

 WALLER, C.J., DICKINSON, P.J., RANDOLPH, LAMAR, KITCHENS, CHANDLER, PIERCE AND KING,
 
 33.,
 
 CONCUR.