ROBERTS, J.,
for the Court:
¶ 1. A jury sitting before the Humphreys County Circuit Court found Melvin Tyrone Thornton guilty of murder. The circuit court sentenced Thornton to life in the custody of the Mississippi Department of Corrections (MDOC). Aggrieved, Thornton appeals. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. Thornton’s conviction stems from events that took place in Belzoni, Mississippi, at approximately 1:00 a.m. on August 29, 2009. Thornton drove a red Ford F-150 pickup truck onto Robinson Street, where he encountered a crowd. Thornton’s progress was impeded by a ear that had been temporarily parked in the street so its headlights could be used to find a lost set of keys. Thornton argued with some members of the crowd after he angrily told people to “[g]et this raggedy-ass car out of the road.” Ultimately, Thornton shot and killed Kerra Williams while Williams was standing in the doorway of Williams’s mother’s house. Thornton fled, but he was arrested a few hours later.
¶ 3. Thornton pled “not guilty” and opted to go to trial. The prosecution called Jesse Thomas, who was then a freshman at Coahoma Community College, as its first witness. Thomas testified that “a guy named Bobby and a guy named Kiki” had been fighting before Thornton drove onto Robinson Street, but they had stopped fighting by the time that Thornton arrived. According to Thomas, there were “a lot” of people outside, and a number of them were using the headlights of a car that had been parked in the street to find a set of keys. Thomas testified that Thornton drove onto *7 Robinson Street and ordered people to move the ear so he could continue driving. Thomas went on to testify that several people said that they intended to comply ■with Thornton’s demands.
¶ 4. Williams interceded and told Thornton that they were not looking for any trouble, but Thornton remained combative even after someone moved the car that had been blocking his path. Eventually, Thornton and Williams began to argue after Williams told Thornton to get back in his pickup truck and leave. Thornton eventually retrieved a pistol from his pickup truck, and several people separated Williams from Thornton. According to Thomas, Thornton had been “waving” the pistol and “pointing it” at Williams. Thomas physically walked Williams toward Williams’s mother’s house. While Williams was standing in the doorway of his mother’s house, Thornton shot Williams.
¶ 5. During cross-examination, Thomas testified that he had his back turned to Thornton at the time that Williams had been shot, so Thomas did not actually see Thornton shoot Williams. Thomas conceded that anyone could have shot Williams. But Thomas remembered that Thornton had been “waving his gun,” and Thornton left immediately after Williams had been shot. On redirect, Thomas testified that he did not see anyone else with a firearm at the time that Williams was shot. Thomas further testified that Thornton had said that he “didn’t care about killing anybody.” Thomas went on to testify that nothing had prevented Thornton from getting in the truck and leaving.
¶ 6. Next, the prosecution called Roderick Bickcom. Bickcom testified that Williams was his brother. Bickcom corroborated Thomas’s testimony that Thornton drove up and demanded that someone move the car that was parked in the street. Bickcom testified that Williams and Thornton began arguing. Bickcom, his uncle, and his brother tried to stop the argument. Thornton parked the pickup truck and got out of it. Williams asked Thornton to leave. Thornton went back to the pickup truck and armed himself with a pistol. Thornton then walked to Williams’s mother’s yard. People encouraged Williams to go into his mother’s house. Bickcom testified that Williams said: “[I]f you put that gun down, I’ll knock your bitch-ass out.” Bickcom saw Thornton shoot Williams as Williams was standing in the doorway to their mother’s house. Williams died a short time later.
¶ 7. Next, the prosecution called Dr. Adele Lewis. Dr. Lewis performed Williams’s autopsy. She testified as an expert in forensic pathology. Dr. Lewis explained that she works for a company in Nashville, Tennessee, that performs autopsies for the Mississippi Crime Laboratory. According to Dr. Lewis, the cause of Williams’s death was a gunshot wound to the chest.
¶ 8. After Dr. Lewis testified, the prosecution called Bobby Forman. Forman testified that he and Thornton are cousins. Forman was present when Thornton shot and killed Williams. In large part, For-man corroborated Thomas’s and Bickcom’s testimony. Forman testified that he had been encouraging Williams to go inside Williams’s mother’s house when Thornton shot Williams. The prosecution rested its case-in-chief after Forman testified.
¶ 9. After the prosecution rested its case-in-chief, Thornton testified in his own defense. According to Thornton, he was driving his father’s pickup truck on his way to visit his sister when he encountered a car that had been blocking the road. He asked a woman to move the car. She was going to comply, but Bickcom told her, “No, we don’t [have] to.” According to *8 Thornton, a number of people surrounded his father’s pickup truck. Thornton testified that he got out of his father’s pickup truck after Williams tried to hit him. When someone tried to get into his father’s pickup truck, Thornton pushed that person out of the way and retrieved a pistol from the pickup truck. Thornton testified that he “tried to calm the situation down, [but people] were still trying to hit [him].” After someone moved the car out of the road, unidentified people were either “putting stuff on the back of [his father’s] truck” or “stealing] things from the truck.” Thornton returned to his father’s truck and told “them” to leave his father’s truck alone. Thornton went on to testify that “before [he] even noticed, [there] was somebody behind [him] that ... came up with a pistol and it went off.” Thornton clarified that someone had touched his shoulder, so he thought someone was trying to take his pistol from him. According to Thornton, he tried to jerk the pistol away, and it went off in the process. Thornton claimed that he did not shoot anyone, and he was only in the area to see his children.[1] Later, Thornton testified that his pistol went off while he was aiming it up in the air. Thornton went to a friend’s house for the rest of the night. The next morning, he was walking down a street when he encountered authorities. Thornton testified that he “laid in the road.”
¶ 10. During its rebuttal, the prosecution called Deputy Ronnie Buchanan of the Humphreys County Sheriffs Department. Deputy Buchanan testified that Thornton was arrested at approximately 6:40 a.m. the same day that Williams had been shot. Thornton had been spotted in some bushes across the street from a hotel where his mother had been staying.
¶ 11. The prosecution also called Sharon Gamill as a rebuttal witness. Gamill testified that she was present when Thornton shot Williams. According to Gamill, Thornton had been “waving a gun in the air” before Williams was killed. Gamill also testified that Williams had been standing in the doorway of his mother’s home when Thornton shot him. Gamill explained that nothing prevented Thornton from getting in his father’s pickup truck and leaving the scene. Gamill further testified that Thornton shot Williams immediately after Williams said he would beat up Thornton if Thornton did not have a pistol. Gamill was approximately seven to eight feet away from Thornton when he shot Williams, and she personally saw him do so. Gamill described most of the people that were gathered on Robinson Street at that time as “high[-]sehool kids.”
¶ 12. As previously mentioned, the jury found Thornton guilty of murder. The circuit court sentenced Thornton to life in the custody of the MDOC. Thornton appeals. Because Thornton moved to dismiss his attorney and proceed pro se, he was not aided by counsel on appeal.[2]
*9 ANALYSIS
I. CAUTIONARY INSTRUCTION
¶ 13. Thornton claims that the circuit court erred when it refused his proposed cautionary instruction. Thornton fails to mention the designation that accompanied the jury instruction that he has in mind. Nevertheless, Thornton argues that he had a right to a cautionary instruction because some of the witnesses for the prosecution were related to Williams. Thornton also argues that the jury should have been instructed that some of the prosecution’s witnesses had been charged with “an offense or the same offense.” According to Thornton, “evidence in the record supported this request,” but he does not elaborate regarding what evidence supported it or where it appears in the record. However, Thornton claims that the circuit court erred when it refused each of his proposed jury instructions or incorporated them into one of the prosecution’s jury instructions.
¶ 14. “Jury instructions generally are within the discretion of the trial court.” Maye v. State, 49 So.3d 1124, 1129 (¶ 7) (Miss.2010). The Mississippi Supreme Court has instructed:
In determining whether error lies in the [giving] or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found. There is no error if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law.
Id. Additionally, “a defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.” Id.
¶ 15. Thornton is mistaken regarding his claim that the circuit court refused all of his proposed jury instructions. The circuit court gave three of Thornton’s proposed jury instructions, which were designated as D-l, D-3, and D^4. Instruction D-l informed the jury that Thornton was presumed innocent. Instruction D-3 stated that the jury was prohibited from convicting Thornton upon mere suspicion or a preponderance of the evidence. And instruction D-4 stated that the jury may find reasonable doubt through a conflict in the evidence, a lack of evidence, or insufficiency of the evidence. Additionally, a portion of proposed jury instruction D-8, which addressed Thornton’s theory of the case, was incorporated into the prosecution’s jury instruction regarding self-defense. Thus, the jury was instructed regarding Thornton’s self-defense theory.
¶ 16. Proposed jury instruction D-2 stated that “if there is any fact or circumstance in this case susceptible of two interpretations, one favorable and the other unfavorable to the accused[,] and if after considering all the other facts and circumstances there is reasonable doubt, then you must resolve such doubt in favor of the accused.” The circuit court refused proposed jury instruction D-2 because it contained language that is only appropriate in a case that is based entirely on circumstantial evidence. “Circumstantial evidence is evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such [a] fact does exist.” McInnis v. State, 61 So.3d 872, 875 (¶ 11) (Miss.2011) (quotations omitted). “A circumstantial-evidence instruction provides that the State must prove the defendant guilty beyond a reasonable doubt and to the exclusion of all reasonable hypotheses consistent with in *10 nocence.” Id. at 875-76 (¶ 11). If any evidence qualifies as “direct” evidence, a circuit court may refuse a circumstantial-evidence instruction. Id. at 876 (¶ 13). An example of direct evidence is “eyewitness testimony to the gravamen of the offense charged.” Id. “The term ‘gravamen’ is defined as the ‘substantial point or essence of a claim, grievance, or complaint.’ ” Id. (citation omitted).
¶ 17. Through eyewitness testimony, there was direct evidence that Thornton shot Williams at a time that Williams posed no physical threat to Thornton. Thornton withdrew proposed jury instruction D-5. And the circuit court found that proposed jury instructions D-6, D-7, D-9, and D-10 were redundant in that they were substantially addressed by other instructions. It was certainly within the circuit court’s discretion to do so.
¶ 18. Thornton also claims that the circuit court should have given “a cautionary instruction ... in regard[ ] to the testimony of the witnesses who had been charged with an offense or the same offense.” But Thornton never submitted such a proposed instruction. “A trial court has no duty to give unrequested instructions.” King v. State, 857 So.2d 702, 717 (¶ 24) (Miss.2003). Therefore, Thornton is procedurally barred from raising this issue for the first time on appeal. See id. Notwithstanding the procedural bar, there is no merit to his claim. Nothing in the record indicates that any of the witnesses had been charged with Williams’s murder. As for their status as members of Williams’s family, Thornton’s attorney addressed that when he cross-examined them. Thus, it was up to the jury to consider their status as family members when the jury weighed their credibility. There is no merit to this issue.
II. SUFFICIENCY OF THE EVIDENCE
¶ 19. Thornton argues that there was insufficient evidence that he acted with malice when he killed Williams. According to Thornton, the prosecution realized that it did not adequately prove he acted with malice because the prosecution withdrew its proposed jury instruction that included the element of malice. Thornton requests that this Court reverse the circuit court’s judgment and render a judgment of acquittal.
¶ 20. The Mississippi Supreme Court has stated:
[I]n considering whether the evidence is sufficient to sustain a conviction in the face of a motion for [a] directed verdict or for [a] judgment notwithstanding the verdict [ (JNOV) ], the critical inquiry is whether the evidence shows beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction. ... [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Should the facts and inferences considered in a challenge to the sufficiency of the evidence point in favor of the defendant on any element of the offense with sufficient force that reasonable [jurors] could not have found beyond a reasonable doubt that the defendant was guilty, the proper remedy is for the appellate court to reverse and render.
Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005) (internal citations and quotations omitted). However, this Court will determine that there was sufficient evi *11 dence to sustain the jury’s verdict if the evidence was “of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions on every element of the offense.” Id. (internal citations and quotations omitted).
¶ 21. Thornton is mistaken when he claims that the prosecution withdrew instruction S-2. He is correct that the prosecution submitted two proposed jury instructions on the elements of murder. Those proposed jury instructions were nearly identical. However, proposed jury instruction S-l omitted the malice element. Proposed jury instruction S-2 instructed the jury that it had to find, beyond a reasonable doubt, that Thornton acted with malice when he killed Williams. The prosecution withdrew proposed jury instruction S-l. The circuit court gave jury instruction S-2. Thus, the jury was instructed that it had to find that Thornton acted with malice.
¶ 22. Numerous eyewitnesses testified that Thornton shot Williams immediately after Williams said that he would beat up Thornton if Thornton did not have a pistol. Williams was not near Thornton when he said that. To the contrary, Williams was standing in the doorway to his mother’s house at the time that Thornton shot him. The supreme court has held that “mere words, no matter how provocative, are insufficient to reduce an intentional and unjustifiable homicide from murder to manslaughter.” Anderson v. State, 79 So.3d 501, 506 (¶ 18) (Miss.2012). The supreme court has also held that “[m]alice ... may be inferred from the use of a deadly weapon.” Id. at 507 (¶24). No one testified that Williams was armed, and no one testified that Williams posed an immediate threat to Thornton. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that Thornton was guilty of murder beyond a reasonable doubt. Accordingly, there was sufficient evidence to support the jury’s verdict. It follows that there is no merit to this issue.
III. WEIGHT OF THE EVIDENCE
¶ 23. Next, Thornton claims that the jury’s verdict is contrary to the overwhelming weight of the evidence. Thornton argues that the evidence was that he was defending himself while being attacked by a crowd. According to Thornton, “had [Williams] and his friends never had the public street blocked[ ] unlawfully, there would never have been an altercation at all....” Thornton requests that this Court reverse the circuit court’s judgment and remand his case for a new trial.
¶ 24. We are mindful that as we review the circuit court’s decision to deny a motion for a new trial, this Court “will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush, 895 So.2d at 844 (¶ 18). The supreme court has further instructed that when reviewing a circuit court’s decision to deny a motion for a new trial:
The motion ... is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict. However, the evidence should be weighed in the light most favorable to the verdict. A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Rather, ... the *12 court simply disagrees with the jury’s resolution of the conflicting testimony. This difference of opinion does not signify acquittal any more than a disagreement among the jurors themselves. Instead, the proper remedy is to grant a new trial.
Id. (footnote and internal citations and quotations omitted).
¶ 25. We discussed the evidence against Thornton in the previous issue. For brevity’s sake, there is no reason to reiterate it here. Suffice it to say, weighing the evidence in the light most favorable to the verdict, it would not sanction an unconscionable injustice to affirm Thornton’s conviction. Consequently, there is no merit to this issue.
IV.FAIR TRIAL
¶ 26. In this issue, Thornton claims he did not receive a fair trial. Thornton’s claim is based on the concept that the prosecution did not charge him with using or displaying a firearm, but the jury found him guilty of murder by using a firearm. Thornton also states that “if a person is engaged in criminal activity at the outset of the incident[,] then that person [has] the capability to enact great personal injury upon someone who intervenes or becomes involved.” We interpret Thornton’s statement to mean that he should be entitled to a presumption that he acted in self-defense because Williams was with a group of people who had temporarily moved a car into the street to use its headlights to find a set of keys.
¶ 27. Thornton cites no authority to support his argument. “When a party on appeal assigns an error without any citation to authority, [appellate courts] will deem this failure to cite any authority as a procedural bar.” Givens v. State, 967 So.2d 1, 8 (¶ 20) (Miss.2007). Accordingly, this issue is proeedurally barred.
V. RULE 403 BALANCING TEST
¶ 28. Next, Thornton claims that the circuit court should have conducted a balancing test under Rule 403 of the Mississippi Rules of Evidence. However, Thornton does not narrow his claim to any specific point in the record. Thornton raised a similar claim in his motion for a JNOV, but he likewise neglected to specify which evidence should have been subject to a Rule 403 balancing test. To be precise, Thornton’s motion for a JNOV simply stated that “[t]he trial judge committed error in failing to conduct the balancing test required by [Rule] 403 before allowing certain items and testimony to be admitted into evidence.” As it stands, we have no way to determine just what evidence he has in mind. Thornton does not cite to any point in the record to support his argument that the circuit court failed to conduct a Rule 403 balancing test. “[W]here a prisoner is proceeding pro se, we will take that into account and, in our discretion, credit not so well[-]pleaded allegations so that a prisoner’s meritorious complaint may not be lost because inartfully drafted.” Ivy v. Merchant, 666 So.2d 445, 449 (Miss.1995). However, we are also mindful that “pro se parties should be held to the same rules of procedure and substantive law as represented parties.” Id. The Mississippi Rules of Appellate Procedure provide that an appellant’s argument “shall contain the contentions of [the] appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on.” M.R.A.P. 28(a)(6). Because Thornton did not cite to the record to direct us to the substance of his claim, this issue is procedurally barred.
VI. IMPROPER JUROR
¶ 29. Next, Thornton claims that the circuit court should have sua sponte *13 excused one of the jury members for cause because she worked as an administrator for the justice-court judge who arraigned Thornton. Thornton argues that the juror had some unspecified knowledge of the case that she used to persuade the other members of the jury to convict him.
¶ 30. Thornton complains about juror 41, Shirley Cummings. During the circuit court’s qualification of the jurors, it asked the venire if anyone worked for law enforcement. Cummings responded and said that she was the assistant to the justice-court judge. The circuit court thanked her and said, ‘You may have a seat.” There were no further discussions regarding Cummings’s employment.
¶ 31. During voir dire, Cummings responded when the circuit court asked if any members of the venire knew Thornton or his family. The circuit court asked her whether her “knowledge of the defendant or his family ... would prevent [her] from being fair and impartial.” Cummings answered that she “would really be fairly impartial.” However, she added that she had “knowledge about the case.” She did not elaborate regarding what she knew about Thornton’s case. The circuit court asked her whether she could “lay that aside.” Cummings said that she could, and she answered affirmatively when the circuit court asked her whether she could “base this case on the evidence that comes from the witness stand and not what [she] already kn[e]w.” In a response to a subsequent question during voir dire, Cummings said that she understood that what she had heard during a justice-court proceeding was not evidence in Thornton’s case, and she could “lay that aside” and “listen to the evidence in this case and base [her] decision on the evidence that comes from the witness stand in [the circuit] court.” Neither Thornton’s attorney nor the prosecution attempted to have Cummings excused as a juror. Ultimately, Cummings sat on the jury that found Thornton guilty of murder.
¶ 32. As previously mentioned, Thornton claims that Cummings was not qualified to serve as a juror because she was an assistant to the justice-court judge who conducted Thornton’s arraignment. Thornton speculates that Cummings used her unspecified prior knowledge of his case to influence the other members of the jury. But Thornton’s attorney did not challenge Cummings for cause or exercise a peremptory challenge on her. “Because there was no contemporaneous objection, this issue is procedurally barred.” Brown v. State, 890 So.2d 901, 909 (¶ 19) (Miss.2004).
¶ 33. Furthermore, there is no evidence regarding the nature of Cummings’s knowledge of Thornton’s case. It is entirely possible that Cummings simply remembered that Thornton had pled “not guilty” during his arraignment. There is certainly no indication that Cummings had influenced any of the other members of the jury or encouraged them to convict Thornton. Additionally, the circuit court instructed the jurors that they were each obligated to “decide this case for yourself,” and they were not to “surrender [their] honest convictions regarding the credibility or weight of the evidence solely because of the opinion of [their] fellow jurors or merely for the purpose of returning a verdict.” The supreme court has instructed that we are to presume that the jurors follow the circuit court’s instructions. Neal v. State, 15 So.3d 388, 402 (¶ 30) (Miss.2009). Nothing in the record indicates that the jurors allowed Cummings to influence their decision to find Thornton guilty of murder. Consequently, this issue is meritless notwithstanding the procedural bar.
*14 VII. CUMULATIVE ERROR
¶ 34. Finally, Thornton claims that the cumulative effect of the errors at trial mandates that he receive a new trial. We have not found that the circuit court committed any errors. It follows that there can be no cumulative effect of errors that do not exist. Brown, 890 So.2d at 922 (¶ 84). Consequently, there is no merit to this issue.
¶ 85. THE JUDGMENT OF THE HUMPHREYS COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HUM-PHREYS COUNTY.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR.

. Forman had been transported from a juvenile-detention facility, but the record does not indicate that he had been charged with any offense that was related to Williams’s death.

. After Thornton moved to dismiss his attorney and proceed pro se, this Court remanded this matter to the circuit court with instructions to conduct an evidentiary hearing as set forth by Rule 6(c)(2) of the Mississippi Rules of Appellate Procedure to determine whether Thornton knowingly and intelligently waives his right to counsel on appeal. During the evidentiary hearing, the circuit court advised Thornton of his rights to the assistance of counsel on appeal. The circuit court also advised Thornton that representing himself may not be in his best interest. When the circuit court asked Thornton whether he still wanted to proceed pro se, he responded affirmatively. Consequently, the circuit court concluded that Thornton knowingly and intelligently waived his right to counsel on appeal.