# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-01218-COA

KEITH ALLEN DAVIS, SR. A/K/A KEITH DAVIS, SR.                    APPELLANT

v.

STATE OF MISSISSIPPI                                             APPELLEE

DATE OF JUDGMENT:            06/25/2013
TRIAL JUDGE:                 HON. ROBERT WALTER BAILEY
COURT FROM WHICH APPEALED:   CLARKE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:      OFFICE OF STATE PUBLIC DEFENDER
                             BY: BENJAMIN ALLEN SUBER
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: LADONNA C. HOLLAND
DISTRICT ATTORNEY:           BILBO MITCHELL
NATURE OF THE CASE:          CRIMINAL - FELONY
TRIAL COURT DISPOSITION:     CONVICTED OF MURDER AND
                             SENTENCED TO LIFE IN THE CUSTODY
                             OF THE MISSISSIPPI DEPARTMENT OF
                             CORRECTIONS
DISPOSITION:                 AFFIRMED - 06/02/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE GRIFFIS, P.J., CARLTON AND MAXWELL, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1.     A Harrison County jury convicted Keith Davis of deliberate-design murder. *See* Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2006).  Davis now appeals his conviction and raises the following issues:  (1) whether there was sufficient evidence to support the jury's verdict; and (2) whether the jury's verdict is against the overwhelming weight of the evidence.  Finding no error, we affirm.

**FACTS**

¶2. A Clarke County grand jury indicted Davis for the murder "and, if not this greater crime, then the lesser crime of" the manslaughter of Nathan Baker. Davis filed a motion with the Clarke County Circuit Court for a change of venue. The circuit court granted Davis's motion and transferred his trial to the Harrison County Circuit Court.

¶3. During the trial, the jury heard testimony that, due to Davis's failure to pay his power bill, an employee from East Mississippi Electric Power Association (EMEPA) arrived at his home on Friday, June 22, 2012, to turn off the power. After speaking with Davis and his wife, the EMEPA employee advised the couple to call the EMEPA office and to request additional time to pay their bill. The EMEPA employee who spoke to the couple over the telephone informed them that they could have until the following Monday to pay their bill.

¶4. Over the weekend, Davis and his wife made several phone calls to friends and family but were unable to collect the $185 they needed to pay their power bill. On the afternoon of Monday, June 25, 2012, Baker arrived at Davis's home to either collect the balance owed on the power bill or to turn off the power. Davis asked Baker for more time to pay the bill and explained that his son had asthma and needed power to use his breathing pump. Despite Davis's pleas, Baker insisted that he had to turn the power off until the bill was paid. Following Baker's refusal to extend the payment deadline, Davis retrieved the gun he owned and shot and killed Baker. Davis then moved Baker's EMEPA truck a few miles down the road and hid Baker's body on the property where his grandparents had lived.

¶5. During the police investigation that followed, the police questioned Davis regarding

Baker's disappearance. Davis eventually made three separate pretrial statements to the police. As the record reflects, each statement varied as to the exact sequence of events leading to Baker's death, but in all three statements, Davis admitted that he killed Baker, moved Baker's truck, and hid Baker's body.

¶6. On Tuesday, June 26, 2012, the day after Baker's murder, Davis gave his first pretrial statement to police. Davis stated that he hit Baker when Baker tried to turn off the power. According to Davis, the two men "tussled," he hit Baker again, and Baker fell to the ground. Davis stated that he then retrieved his gun from inside the house, the two men fought over the gun, and the gun discharged at least twice, hitting Baker in his left side. Davis stated that Baker grabbed the gun, but Davis hit Baker, regained control of the gun, and hit Baker in the head with the gun. Davis asserted that Baker then bit him on his left arm, and Davis shot Baker once more. The next morning, Davis dug holes in his yard and burned his grass with gasoline to try to hide Baker's bloodstains.

¶7. Almost a month later, on July 27, 2012, Davis gave his second pretrial statement to police. In this statement, Davis said that he told his wife that, no matter who EMEPA sent to their house on Monday, June 25, 2012, he would not allow that person to turn off the power. Davis stated that he retrieved his gun on Saturday and began firing it. Although Davis told his neighbor's child that he was using the gun for target practice, Davis also admitted in his statement that he wanted to see what impact the gun would have and how loud the noise would be.

¶8. Davis stated that he awoke around 6 a.m. on Monday, June 25, 2012, and waited

3

outside for the EMEPA employee to arrive. Davis told his children to turn up the volume on their video game and, no matter what they heard, to stay inside the house. He also said that he eventually went back inside to retrieve his gun, which he placed in a chair close to the power meter.

¶9.     According to Davis's statement, he shot Baker when Baker refused to extend the payment deadline. Davis stated that Baker then tried to grab the gun, and the two men wrestled for control of the weapon. Davis again stated that Baker bit him on his left arm, but Davis managed to regain control of the gun and shoot Baker in his left side. Davis then hit Baker in the head and face several times with the butt of the gun. Baker fell to the ground, and because the gun kept jamming, Davis grabbed a nearby shovel and hit Baker in the head. Davis said that, although Baker begged for his life, he shot Baker in the head.

¶10.     In a third pretrial statement to police, which was videotaped, Davis stated that he planned to ask the EMEPA employee who came to his house on Monday for an extension. However, if the EMEPA employee refused, Davis admitted that he was prepared to do what was needed to keep the power on, including taking the EMEPA employee's life. Davis instructed his wife and children to stay inside the house on Monday. He also stated that he retrieved his gun on Saturday for target practice and that, around 8 a.m. or 9 a.m. on Monday, he fired several more shots to see how loud the noise would be.

¶11.     After firing his gun on Monday morning, Davis stated that he placed the gun in a lawn chair near the power meter. When Baker arrived and refused to extend the payment deadline, Davis stated that he followed Baker to the power meter, grabbed the gun, and shot Baker in

4

the left side. According to Davis's third statement, he and Baker struggled for control of the gun, and the gun discharged a second time. During the struggle, Baker bit Davis on the left arm. After regaining control of the gun, Davis hit Baker in the head several times with the gun. Davis then hit Baker in the head with a nearby shovel and, while Baker was still on his knees, Davis shot Baker a final time.

¶12. At trial, Davis's testimony regarding the events leading to Baker's death differed from his three pretrial statements. Davis testified that he only retrieved his gun from inside the house after Baker arrived and refused to extend the payment deadline. Davis further testified that he had no intention of killing Baker and only used the gun to force Baker to leave. Davis testified that Baker attempted to grab the gun, causing the gun to discharge. Davis further testified that Baker gained possession of the gun, and the two men then wrestled for control of the weapon. According to Davis's testimony, Baker punched him in the nose, and the gun discharged a second time. Davis testified that he regained possession of the gun but then lost possession when Baker bit his left arm. Davis claimed that Baker then tried to shoot him, but the gun misfired. Davis testified that he then grabbed the shovel and hit Baker. Davis further testified that the two men continued to fight over the gun and that, when Davis regained control of the weapon, he shot Baker a third time.

¶13. After Baker failed to report to work on Tuesday, June 26, 2012, EMEPA notified the authorities, who learned that Baker also failed to return home the previous evening. Using its tracking software, EMEPA discovered that Baker's company truck had been at Davis's house for almost thirty-eight minutes the previous day. EMEPA's software also showed that

5

Baker's truck was now parked about two miles from Davis's home. Deputy Elton Davis with the Clarke County Sheriff's Department investigated the matter and found Baker's truck parked on a side road between a field and some woods. After securing the area around the truck, Deputy Davis visited Davis's home, which was Baker's last scheduled stop prior to his disappearance.

¶14. Deputy Davis testified that the sheriff's department obtained a warrant to search Davis's house after questioning Davis. According to Deputy Davis's testimony, Davis originally claimed that Baker agreed to give him another day to pay his power bill. However, Deputy Davis testified that, when the authorities searched Davis's house, they found what appeared to be blood on the ground around Davis's power meter, as well as marks indicating signs of a struggle and of an object being dragged through the grass. Deputy Davis further testified that some of the ground around the area was burned, as though gasoline had been poured on the grass to cover up the bloodstains. In addition, Deputy Davis testified that Davis had a bite mark on his left arm. Although Davis initially claimed a dog bit him, the investigation revealed that Baker inflicted the wound during his struggle with Davis.

¶15. Investigator Gary Kelly with the Clarke County Sheriff's Department also testified at Davis's trial. Investigator Kelly testified that authorities found a shovel by Davis's power meter and that the shovel appeared to have dried blood on it. Investigator Kelly also testified to seeing the burned grass around Davis's yard and to photographing several nine-millimeter casings discovered in Davis's yard. While being interviewed by authorities, Davis eventually admitted that he hid Baker's body on the property where his grandparents had raised him.

Davis later accompanied law enforcement to the location. Investigator Kelly testified that Davis had covered Baker's body with a blanket and then piled wood, an old suitcase, and other items on top of the blanket to hide the body.

¶16. The forensic pathologist who examined Baker's body testified that Baker sustained blunt-force injuries, including a fractured skull, and three gunshot wounds to his head, chest, and arm. Tests performed by the Mississippi Crime Laboratory confirmed that the nine-millimeter casings found in Davis's yard matched the bullets removed from Baker's body. The tests further confirmed that all of the nine-millimeter projectiles were fired by Davis's gun.

¶17. After considering the testimony and evidence presented at trial, the jury found Davis guilty of Baker's murder. The circuit court judge sentenced Davis to life in prison in the custody of the Mississippi Department of Corrections. Davis filed an unsuccessful motion for a new trial or, in the alternative, a judgment notwithstanding the verdict (JNOV). Aggrieved, Davis now appeals.

**STANDARD OF REVIEW**

¶18. When addressing an argument regarding the legal sufficiency of the evidence, this Court applies the following standard of review:

> [T]he critical inquiry is whether the evidence shows beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed. If, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that the essential elements of the crime existed, this Court will affirm the conviction. The jury determines the credibility of witnesses and resolves conflicts in the evidence.

*Barron v. State*, 130 So. 3d 531, 536 (¶13) (Miss. Ct. App. 2013) (internal citations and quotation marks omitted).

¶19. Where a defendant challenges the weight of the evidence, this Court "only disturb[s] a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush v. State*, 895 So. 2d 836, 844 (¶18) (Miss. 2005) (citation omitted). Furthermore, we weigh the evidence in the light most favorable to the verdict, recognizing that "the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." *Id.* (quoting *Amiker v. Drugs For Less Inc.*, 796 So. 2d 942, 947 (¶18) (Miss. 2000)).

## DISCUSSION

### I.     Whether there was sufficient evidence to support the jury's verdict.

¶20. Davis asserts the evidence is insufficient to support the jury's verdict because the State failed to prove beyond a reasonable doubt that he failed to act in necessary self-defense. Davis further asserts that, at most, the evidence supports a manslaughter conviction rather than a murder conviction. Because both of these arguments address the legal sufficiency of the evidence, we address them together.

¶21. As previously stated, we apply the following standard of review to determine whether evidence is legally sufficient:

> [T]he critical inquiry is whether the evidence shows beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed. If, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that the essential elements of the crime existed, this Court will affirm the conviction. The jury determines the

8

credibility of witnesses and resolves conflicts in the evidence.

*Barron*, 130 So. 3d at 536 (¶13) (internal citations and quotation marks omitted).

¶22.    Davis's indictment charged that he "wilfully, unlawfully, and feloniously, with deliberate design to effect the death of Nathan Baker, did kill and murder Nathan Baker, a human being, without authority of law and not in necessary self[-]defense, by shooting him" in violation of section 97-3-19(1)(a).    The circuit court judge instructed the jury on deliberate-design murder, which section 97-3-19(1)(a) defines as "[t]he killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human being[.]"    To prove deliberate-design murder, the State had to show the following beyond a reasonable doubt: (1) Davis killed Baker; (2) without the authority of law; and (3) with deliberate design to effect Baker's death.    *See Barron*, 130 So. 3d at 536 (¶14).

¶23.    Davis asserts on appeal that, at most, the evidence supports a manslaughter conviction, and he argues the events leading to Baker's death demonstrate that he acted in the heat of passion rather than with premeditation or deliberate design.    Our caselaw establishes that "the issue of whether [a defendant] may have committed murder, [committed] manslaughter[,] or acted in self[-]defense is a question for the jury."    *Webster v. State*, 817 So. 2d 515, 520 (¶18) (Miss. 2002) (citing *Danner v. State*, 748 So. 2d 844, 846 (¶¶5-8) (Miss. Ct. App. 1999)).

¶24.    At Davis's trial, the State possessed the burden to prove beyond a reasonable doubt the elements of deliberate-design murder charged in Davis's indictment.    *See* Miss. Code Ann. § 97-3-19(1)(a).    The State further bore the burden of proving that, in killing Baker,

9

Davis acted in a manner inconsistent with self-defense. *See Wilder v. State*, 118 So. 3d 628, 631 (¶9) (Miss. Ct. App. 2012). Our statutory law provides that the killing of a human being is justified "[w]hen committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished." Miss. Code Ann. § 97-3-15(1)(f) (Rev. 2006). "A successful self-defense argument requires that the jury believe that it was objectively reasonable for the defendant to believe he was in danger of imminent death or serious bodily harm." *Wilder*, 118 So. 3d at 631 (¶9) (quoting *Livingston v. State*, 943 So. 2d 66, 71 (¶13) (Miss. Ct. App. 2006)). "The question of whether the defendant acted in self-defense is a question for the jury to resolve." *Id.* (citation omitted).

¶25. Based on the evidence and testimony presented at trial, we find sufficient evidence existed for a jury to find beyond a reasonable doubt that Davis acted with deliberate design to murder Baker. Other than Davis's own assertions that he acted in the heat of passion or in self-defense, the evidence presented at trial overwhelmingly supported Davis's conviction for deliberate-design murder. The evidence showed that Davis, without any threat or provocation from Baker, initiated the altercation and then used a deadly weapon to shoot and kill Baker. The evidence further reflected that Davis pre-planned the murder and committed Baker's murder with deliberate design. As reflected in the record, the evidence presented at trial to support Davis's conviction included Davis's own pretrial statements, corroborating evidence found at the crime scene, and testimony demonstrating that Davis possessed both

10

a motive and an opportunity to kill Baker.

¶26. In his pretrial statements to police, Davis said he told his wife prior to the murder that he would not allow the EMEPA employee to turn off the power. Furthermore, Davis admitted that he was prepared to do whatever was necessary to keep the power on, including killing the EMEPA employee. Davis also stated in his pretrial statements that he practiced shooting his gun over the weekend to see the impact the gun would have and how loud the noise would be. In addition, Davis stated that he told his children to stay inside the house no matter what happened and to turn up the volume on their video game. While waiting for Baker to arrive on Monday morning, Davis put his gun in a chair near the power meter. When Baker refused to extend the payment deadline, Davis said in his pretrial statements that he shot Baker three times, including in the head, and hit Baker multiple times with his fists, his gun, and a shovel.

¶27. In addition to offering into evidence Davis's incriminating pretrial statements, the State presented testimony from the forensic pathologist. According to the forensic pathologist, Baker sustained blunt-force injuries, including a fractured skull, and three gunshot wounds to his head, chest, and arm. As reflected in the record, the forensic pathologist's testimony regarding Baker's wounds was consistent with Davis's pretrial statements that the circuit court admitted into evidence.

¶28. The State also presented testimony from Deputy Davis and Investigator Kelly, who both testified that authorities found signs of a struggle on the ground near Davis's power meter. The investigators discovered several nine-millimeter projectiles in the grass that

11

matched the bullets recovered from Baker's body. In addition, they observed that the ground around Davis's power meter had been dug up and burned with gasoline to hide Baker's bloodstains. The investigators also found a nearby shovel that appeared to have dried blood on it. Like the forensic pathologist's testimony, the investigators' testimonies were consistent with Davis's pretrial statements and supported Davis's conviction for deliberate-design murder.

¶29. As the record reflects, the circuit court judge instructed the jury on both deliberate-design murder and manslaughter. Mississippi Code Annotated section 97-3-35 (Rev. 2006) defines manslaughter as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense[.]" Mississippi caselaw has previously defined heat of passion as follows:

> A state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter[;] [p]assion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment[,] or terror.

*Givens v. State*, 967 So. 2d 1, 11 (¶33) (Miss. 2007) (quoting *Mullins v. State*, 493 So. 2d 971, 974 (Miss. 1986)).

¶30. Because the circuit court judge instructed the jury on the offense of manslaughter, we acknowledge that the jury determined the factual question of whether Davis's actions amounted to deliberate-design murder. *See Webster*, 817 So. 2d at 520 (¶18). Given the jury's verdict finding Davis guilty of murder, the jury clearly considered the evidence and

12

then rejected Davis's self-defense claim and resolved any issues regarding witness credibility and conflicting evidence in favor of the State.[1]  Viewing the evidence in the record in the light most favorable to the State, we find that a rational juror could have found that the State proved beyond a reasonable doubt the essential elements of deliberate-design murder.  *See Barron*, 130 So. 3d at 536 (¶13).  As a result, we find that this argument lacks merit.

## II.     Whether the jury's verdict is against the overwhelming weight of the evidence.

¶31.    Davis next asserts that the jury's verdict is against the overwhelming weight of the evidence.  As previously acknowledged, when reviewing a challenge to the weight of the evidence, "we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice."  *Bush*, 895 So. 2d at 844 (¶18) (citation omitted).  This Court weighs the evidence in the light most favorable to the verdict, and we recognize that "the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict."  *Id.* (quoting *Amiker*, 796 So. 2d at 947 (¶18)).

¶32.    "It is well established that matters regarding the weight of the evidence are to be resolved by the jury."  *Webster*, 817 So. 2d at 518 (¶13) (quoting *Danner*, 748 So. 2d at 846 (¶7)).  With regard to this particular assignment of error, Davis once again asserts that the evidence established he acted in self-defense.  As previously acknowledged, the State bore

---

[1] *See Barron*, 130 So. 3d at 536 (¶13) (discussing that the jury determines witness credibility and resolves conflicts in the evidence); *Harrison v. State*, 724 So. 2d 978, 981 (¶7) (Miss. Ct. App. 1998) (stating that appellate courts assume jurors follow the instructions given to them by the trial court).

13

the burden of proving that Davis's actions were not committed in necessary self-defense. *See Wilder*, 118 So. 3d at 631 (¶9).

¶33. To dispute Davis's claim of self-defense, the State offered into evidence Davis's own pretrial statements, which reflected that Davis initiated an altercation after Baker refused to extend Davis's payment deadline for his power bill. In Davis's pretrial statements that were before the jury for its consideration, Davis admitted that, prior to the shooting, he test fired his gun over the weekend and then placed the gun near the power meter before Baker arrived. The pretrial statements the State submitted into evidence at trial also revealed that Baker was unarmed when Davis threatened him with the gun and that Baker failed to provoke Davis through any type of verbal or physical threat. By returning a guilty verdict, the jury clearly demonstrated that it found the State met its burden to prove beyond a reasonable doubt that Davis committed deliberate-design murder and failed to act in necessary self-defense.

¶34. As our caselaw provides, a jury's resolution regarding the weight of the evidence remains undisturbed unless allowing the jury's verdict to stand would sanction an unconscionable injustice. *See Bush*, 895 So. 2d at 844 (¶18). Viewing the evidence in this case in the light most favorable to the verdict, we cannot say that the verdict is against the overwhelming weight of the evidence or that allowing the verdict to stand would sanction an unconscionable injustice. We therefore find that this argument lacks merit.

¶35. **THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AND THE JUDGMENT OF THE CLARKE COUNTY CIRCUIT COURT DENYING THE MOTION FOR A NEW TRIAL OR, IN THE ALTERNATIVE, A JUDGMENT NOTWITHSTANDING THE VERDICT, ARE AFFIRMED. ALL COSTS OF THIS APPEAL ARE**

14

**ASSESSED TO CLARKE COUNTY.**

    **LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, MAXWELL, FAIR AND JAMES, JJ., CONCUR.**